FILED
2026 Apr-15  PM 10:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JACKIE L. MILLER,

      **Plaintiff,**

v.

REGIONS BANK,

      **Defendant.**

**Case No.2:24-cv-1324-ACA**
**OPPOSED IN PART**

## DECLARATION OF HOYT GREGORY HARP

My name is Hoyt Gregory Harp.  I am over the age of 19.  I have personal knowledge of each fact averred below.  I am otherwise capable of making this declaration.

1. Pursuant to the Show Cause order (the "Order") issued to the Declarant in this case, the Declarant certifies under penalty of perjury that the Declarant has provided a copy of the Order to my client Jackie Miller ("Ms. Miller (doc. 29, pg. 4).

2. The undersigned contacted Ms. Miller by telephone on Sunday, April 12, 2026 in order to alert her to the existence of the Order.  Ms. Miller and the undersigned had a 37-minute telephone call regarding the Order during which the undersigned answered any questions and addressed any concerns raised by Ms. Miller.

3. On Sunday April 12, 2026, at 4:42 PM (CDT), the undersigned sent electronic mail to Ms. Miller.  The subject of the email was "Doc. 29 Show Cause Order.

1

Attached to that email was a portable document format file ("PDF") named "Miller – Doc. 29 Show Cause Order.pdf".

4.    On Sunday April 12, 2026, at 4:56 PM (CDT), Ms. Miller sent an email to the undersigned that confirmed that she had received the undersigned email which contained the PDF.

5.    As ordered by the Court, the undersigned has reviewed all filings made by the undersigned in this case.  The first filing made in this case was the original complaint.  A review of the original complaint did not reveal the presence of any cited legal authority.[1]

6.    The undersigned does aver that prior to filing the complaint, he investigated the claims alleged in the original complaint by interviewing Ms. Miller and reviewing documents provided to him by Ms. Miller.  Attached hereto as Exhibit A is a copy of the printout of Pacer's history show access to each filing made by the undersigned.

7.    The second filing signed by the undersigned, including the complaint filed before the case was removed in this case was a jointly filed Report of Parties'

---

[1] The undersigned avers that this is a removal action and the original complaint in this case was filed in the Circuit Court of Jefferson, Alabama, with a case number of 01-cv-2024-902992.  The undersigned accessed the filing in that case and found no citation to case law in the original complaint.

Planning Meeting filed on Jine 30, 2025 (doc. 11). The undersigned's review of the Report did not contain any cited legal authority.

8.     The third filing made in this case and signed by the undersigned was a Motion for Leave to File Motion to Extend Discovery Cutoff Deadline (doc. 12). A review of this filing by the undersigned showed no citation to case law or other authority.

9.     The fourth and final filing made by the undersigned in this case up until the date of the Court's show cause order was the response in opposition to summary judgment (the "Response") (doc. 23) which is the subject of the show cause order (doc. 29).

10.    After receiving the Order, the undersigned has complied with the Court's directive and untaken a review of the Response, specifically the cited authority therein, in order to ensure that there are no willful misstatements or misrepresentations of law.

11.    The undersigned has confirmed that each of the cases, statutes, and regulations cited in the Response are actual and real cases.

12.    A review of the filed Response shows that 19 cases were cited in the Response. Additionally, the Response contains one citation to the Federal Rules of Civil Procedures, and three citations are made to the Code of Federal Regulations.

13.    One of the 19 citations is *Allen v. Bd. of Pub. Educ. for Bibb Cnty*., 495 F.3d 1306, 1314 (11th Cir. 2007) (doc. 23, pp. 7-8). During review, the undersigned found

3

that due to a Scrivener's error, the undersigned typed Southern Reporter page 1314 instead of 1315 as the location of the quote "if a reasonable factfinder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment."

14.    The quote appears in *Allen* and is an actual quote.  The undersigned did add emphasis to the quote by bolding the last four words of the quote; but alerted the reader of the added emphasis by using the Bluebook signal "emphasis added" in parentheticals.

15.    In review, the undersigned discovered that in making an inline quote from *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011), the undersigned misplaced a quotation mark (doc. 23, pg. 8).  The passage in question reads "Because the summary judgment standard "does not allow a court to weigh conflicting evidence or make credibility determinations," immediately followed by the citation to *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011).

16.    The opening quotation mark should have appeared just before the word "weigh".  A copy of the cited authority with the passage highlighted is attached hereto as Exhibit B.

17.    In review, the undersigned has discovered that the citation to *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336 (11th Cir. 2022) was incorrectly cited by the undersigned (doc. 23, pg. 8).  The undersigned cited the case as *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336 (11th Cir. 2022), 1352; instead of correctly citing it as *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022).

18.    The review of the Response indicated that the undersigned argued that in *Jones v. Aaron's Inc., 748 F. App'x 907, 911–13 (11th Cir. 2018)*,  the Eleventh Circuit vacated summary judgment.  The undersigned points out to the Court that while the Eleventh Circuit did vacate summary judgment, it was only to the plaintiff's FMLA claims.

19.    The methodology used by the undersigned in drafting the Response was essentially the same method, with certain differences that the undersigned has used the entirety of his career as a lawyer, and before as a paralegal.

20.    After receiving an email on November 11, 2025, which contained a link to a copy of the motion for summary judgment (doc. 19), the motion's accompanying evidentiary material (doc. 20) and brief in support of summary judgment (doc. 21), the undersigned provided the same to Ms. Miller and asked her to review the documents.

21.    The undersigned uses vLex (formerly known as Fastcase) for legal research. In the past, the undersigned has used Westlaw and Lexis-Nexis for legal research purposes.

21.    vLex is a legal research platform offered free to members of the Alabama State Bar.  vLex is used extensively by small firms and solo practitioners for legal research purposes.

22.    In the instant case, the undersigned used vLex for the purpose of researching legal authority in order to draft and file the Response.  Attached hereto as Exhibit C is the history printout of the undersigned's vLex search history related to legal authority used in the Response.

23.    The undersigned has always used parentheticals to (1) quote specific language from authority and (2) offer the undersigned's interpretation of an authority cited.

24.    This is what the undersigned did in this case.

25.    When the undersigned finishes a brief such as the Response, the undersigned does use a feature on Word called "Copilot" to check for grammar, punctuation and spelling errors.

26.    The undersigned has not always used the Copilot feature as it was not released until February 7, 2023, and the undersigned began using the Copilot feature in Word at some point after in certain circumstances.

6

27.    When filing in federal court using Pacer, the undersigned must undergo a process by which the Word document must be converted to a .pdf.

28.    After the Word document is converted to a .pdf, in order for the undersigned to be able to file the .pdf document in Pacer, the undersigned must first open the .pdf document to be filed in PDF Studio, a third-party application.  After the .pdf document is opened in PDF Studio, the undersigned must then "flatten" the document electronically to remove macros indigenous to Word, resave the .pdf and then proceed with filing through Pacer.  If the document is not flattened, Pacer will reject the document as being potentially malicious.

29.    The undersigned's explanation for the presence of quotations in *Holly v. Clairson Indus., L.L.C.*, *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1345 (11th Cir. 2016), *Breen v. Dep't of Transp.*, 282 F.3d 839, 842 (D.C. Cir. 2002) and *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018) is simply the quotations should have never appeared in the parentheticals.

30.    A more thorough explanation is that some place between the undersign researching the cases and deciding to use certain cases in the Response, quotations marks were placed in the parentheticals in the cases at issue which had the embarrassing effect of turning argument of counsel into what appeared to be quoted authority.

31.    A review of the filed Response embarrassingly shows that the Response contains numerous typographical errors as well as missing lines of text (*see e.g.* doc. 23, pg. 34).  The undersigned has no logical explanation why the Response was filed with such errors.

32.    The undersigned has made hundreds of filings in both state and federal court and has never had these types of issues with a filed document.  In fact, the undersigned is routinely contacted by other attorneys for assistance on legal research and brief writing.

33.    The undersigned has handled cases in federal courts in Alabama, Tennessee, Florida, and Arkansas and has never had any of his filings rejected or called into question by either opposing counsel or the courts.

Further the Declarant sayeth not.

I declare under penalty of perjury that the foregoing statements are all true and correct.

_____
Hoyt Gregory Harp, Declarant

8

CM/ECF - U.S. District Court for the District of Alabama

**2:24-cv-01324-HDM** Miller v. Regions Bank
Harold D Mooty, III, presiding
**Date filed:** 09/27/2024
**Date of last filing:** 04/10/2026    **EXHIBIT A**

# History

| Doc. No. | Dates | Description |
|---|---|---|
| [1] | *Filed & Entered:* 09/27/2024 | Notice of Removal |
| [2] | *Filed & Entered:* 09/27/2024 | Answer to Complaint |
| [3] | *Filed & Entered:* 09/27/2024 | Corporate Disclosure Statement |
| [4] | *Filed & Entered:* 09/29/2024 | Uniform Initial Order |
|  | *Filed & Entered:* 09/30/2024 | Filing Fee - Pay.gov |
| 5 | *Filed & Entered:* 09/30/2024 | Order |
| [6] | *Filed & Entered:* 10/28/2024 | Order |
| [7] | *Filed & Entered:* 11/07/2024 | Notice (Other) |
| [8] | *Filed & Entered:* 11/26/2024 | Order |
| [9] | *Filed & Entered:* 01/02/2025 *Terminated:* 01/08/2025 | Motion for Protective Order |
| [10] | *Filed & Entered:* 01/08/2025 | Protective Order |
| [11] | *Filed & Entered:* 07/30/2025 | Status Report |
| [12] | *Filed & Entered:* 08/25/2025 *Terminated:* 09/08/2025 | Motion for Leave to File |
| [13] | *Filed & Entered:* 08/28/2025 | Response in Opposition to Motion |
| 14 | *Filed & Entered:* 09/08/2025 | Order |
| [15] | *Filed & Entered:* 09/09/2025 *Terminated:* 09/09/2025 | Motion to Withdraw as Attorney |
| [16] | *Filed & Entered:* 09/09/2025 *Terminated:* 09/12/2025 | Motion for Leave to Appear |
| 17 | *Filed & Entered:* 09/09/2025 | Order on Motion to Withdraw as Attorney |
| 18 | *Filed & Entered:* 09/12/2025 | Order on Motion for Leave to Appear |
|  | *Filed & Entered:* 10/27/2025 | Case Assigned/Reassigned |
| [19] | *Filed & Entered:* 11/04/2025 | Motion for Summary Judgment |
| [20] | *Filed & Entered:* 11/04/2025 | Evidentiary Material |
| [21] | *Filed & Entered:* 11/05/2025 | Brief |
| [22] | *Filed & Entered:* 11/06/2025 | Notice of Appearance |
| [23] | *Filed & Entered:* 11/30/2025 | Response in Opposition to Motion |
| [24] | *Filed & Entered:* 11/30/2025 | Evidentiary Material |
| [25] | *Filed & Entered:* 12/01/2025 | Evidentiary Material |
| [26] | *Filed & Entered:* 12/01/2025 | Notice (Other) |
| [27] | *Filed & Entered:* 12/15/2025 | Reply Brief |

| 28 | *Filed & Entered:* 12/16/2025 | ⊕ Order |
| | *Filed & Entered:* 01/12/2026 | ⊕ Status Conference |
| 29 | *Filed & Entered:* 04/10/2026 | ⊕ Order to Show Cause |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/15/2026 12:59:36 | | |
| **PACER Login:** | gregoryharp | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 2:24-cv-01324-HDM |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

printed by gh@gregoryharplaw.com (Bar edition)

# EXHIBIT C

ID vLex: 888778865
http://case-law.vlex.com/vid/group-v-findwhat-com-888778865

## Group v. Findwhat.Com   ○ Distinguished ▾

**Court:** U.S. Court of Appeals — Eleventh Circuit

**Writing for the Court:** MARCUS, Circuit Judge:

**Citation:** Group v. Findwhat.Com, 658 F.3d 1282, 23 Fla. L. Weekly Fed. C 453 (11th Cir. 2011)

**Decision Date:** 30 September 2011

**Docket Number:** No. 10–10107. , 10–10107.

**Parties:** FINDWHAT INVESTOR GROUP, on behalf of itself and all others similarly situated, et al., Plaintiffs–Appellants,v.FINDWHAT.COM, Craig Pisaris–Henderson, Phillip R. Thune, Defendants–Appellees.

**658 F.3d 1282**

**23 Fla. L. Weekly Fed. C 453**

**FINDWHAT INVESTOR GROUP, on behalf of itself and all others similarly situated, et al., Plaintiffs–Appellants,**

**v.FINDWHAT.COM, Craig Pisaris–Henderson, Phillip R. Thune, Defendants–Appellees.**

**No. 10–10107.**

**United States Court of Appeals, Eleventh Circuit.**

**Sept. 30, 2011.**

Maya Saxena, Lester R. Hooker, Christopher Steven Jones, *1290 Joseph Edward White, III, F.3d 1290 Saxena White, PA, Stephen Richard Astley, Paul J. Geller, David J. George, Jack Reise, Robert Jeffrey Robbins, Robbins Geller Rudman & Dowd, LLP, Julie Prag Vianale, Kenneth J. Vianale, Vianale & Vianale, LLP, Boca Raton, FL, Chris

A. Barker, Barker Rodems & Cook, PA, Tampa, FL, Marc J. Greenspon, Michael J. Pucillo, Berman DeValerio, Palm Beach Gardens, FL, for Plaintiff–Appellant.Todd R. David, Susan Elaine Hurd, Robert R. Long, Alston & Bird, LLP, Atlanta, GA, Joseph Gerard Foster, Porter Wright Morris & Arthur, LLP, Gregory N. Woods, Grant Fridkin Pearson Athan & Crown, Naples, FL, for Defendants–Appellees.Appeal from the United States District Court for the Middle District of Florida.**Before HULL and MARCUS, Circuit Judges, and COOKE,[*] District Judge.MARCUS, Circuit Judge:**

In this securities fraud class action, the investor Plaintiffs sued the Defendant company MIVA, Inc. ("MIVA")[1] and three of its principal officers,[2] alleging that they had made a series of eleven false or misleading statements to the public, in violation of § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder. The Plaintiffs claimed that the false statements had the effect of artificially inflating the price of MIVA's stock until the truth

belatedly came out, at which time the stock price dropped and the Plaintiffs suffered substantial financial losses.

The district court rejected all of the Plaintiffs' claims. It dismissed nine of the eleven allegedly misleading statements on the pleadings for failure to state a claim. The district court then granted summary judgment to the Defendants with respect to the remaining two statements, on the grounds that the Plaintiffs had failed to demonstrate genuine issues of material fact regarding loss causation and damages. The Plaintiffs have appealed both of these orders, placing before us today claims deriving from four of the original eleven statements made by the Defendants—two that were dismissed as insufficiently pled, and two that were rejected at summary judgment.

After thorough review, we hold that the district court properly dismissed the Plaintiffs' claims arising from the alleged misstatements made on March 5, 2004 and July 26, 2004, because the Plaintiffs have inadequately pled scienter and falsity, respectively. However, as for the

Plaintiffs' claims arising out of the Defendants' February 23, 2005 and March 16, 2005 statements, we vacate the district court's entry of summary judgment. We hold that the securities laws prohibit corporate representatives from knowingly peddling material misrepresentations to the public—regardless of whether the statements introduce a new falsehood to the market or merely confirm misinformation already in the marketplace. In other words, a defendant may be liable for *1291 fraudulent statements F.3d 1291 intentionally made that have the purpose and effect of propping up an already inflated stock price in an efficient market. Accordingly, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

# I. *Facts and Procedural History*

Since we assume the Plaintiffs' factual allegations to be true when reviewing a motion to dismiss, *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir.2006), and the Defendants do not dispute the relevant facts for purposes of summary judgment, we take the relevant facts from the Plaintiffs' First Amended Consolidated Class Action Complaint ("Complaint") and other documents submitted or incorporated by reference by the Plaintiffs.

## A. *Background on MIVA*

MIVA is an Internet commerce company that provides "pay-per-click" advertising services. (Compl. ¶ 2). MIVA places advertisements for online sellers on the websites of numerous entities with whom MIVA contracts (called MIVA's "distribution partners" or "affiliates"). The advertisers pay MIVA each time an Internet user "clicks" on their ad. MIVA then shares a portion of that revenue with its network of distribution partners—the websites that first generated the click.

MIVA contracts with the advertisers on a keyword-targeted, bid-for-position, pay-per-click basis. ( *Id.* ¶ 23). Keyword-targeted advertising allows advertisers to reach a targeted audience: the advertisement appears on the user's computer screen only if a user types a particular keyword or keyword phrase into a search box on a website of one of MIVA's

distribution partners. ( *Id.* ¶ 23 n. 6 (and materials cited therein)). Bid-for-position means that the advertisers bid against each other for ad placement. ( *Id.* ¶ 23 n. 4). The highest bidder for a particular keyword receives the first-place advertisement position with respect to that keyword, and the other advertisers for that keyword are listed in descending bid order. ( *Id.*) Pay-per-click means that an advertiser only pays when an Internet user clicks on its ad and gets transferred to its website. ( *Id.* ¶ 23 n. 5). These clicks are supposed to be highly qualified leads likely to convert into a sale, since the user intentionally clicked on the ad and, therefore, presumably has some interest in the advertised product. ( *Id.*)

Not surprisingly, it's very important to MIVA to generate high-quality Internet traffic for its advertisers. MIVA's revenue is determined by the price that advertisers bid for a click on their ads and the number of clicks MIVA can generate on those ads. ( *Id.* ¶ 28). The price an advertiser is willing to bid depends on the advertisement's conversion rate, i.e., the rate at which the seller's advertising expenditure

translates into additional sales income. ( *Id.*) The greater the sales conversion rate, the more the advertiser is willing to bid on a particular keyword. ( *Id.* ¶¶ 25–26, 28). Conversely, the more advertiser-paid clicks that fail to translate into income for the advertiser—in other words, the lower the conversion rate—the lower the price that advertisers are willing to bid. ( *Id.* ¶¶ 4, 28). Therefore, it is essential to MIVA's success that the clicks it directs to its advertisers have a high conversion rate, that is, that they frequently translate into actual sales. ( *Id.* ¶¶ 25–26).

## B. *The Plaintiffs' Allegations of Click Fraud Within MIVA's Network*

"Click fraud" generally refers to the practice of clicking on an Internet advertisement for the sole purpose of forcing the advertiser to pay for the click. ( *Id.* ¶ 43). Because advertisers only pay when someone clicks through to their website, artificial clicks can be very costly to advertisers. *1292 ( *Id.*)    F.3d 1292 Click fraud includes the use of illicit practices such as spyware, browser hijacking software, and other "bots"

or "non-human traffic." [3] ( *Id.* ¶¶ 43–44). Such practices result in lower sales conversion rates for advertisers because the leads are false—they do not come from actual buyers interested in purchasing the advertised products. ( *Id.* ¶ 26). Because lower conversion rates lead to lower advertiser bids and thus to decreased revenue, ensuring the quality of its distribution partners and eliminating improper Internet traffic are extremely important for a pay-per-click company such as MIVA.

According to the Plaintiffs' allegations, in or around 2003, two of MIVA's top revenue-generating distribution partners ("Saveli" and "Dmitri")—who together generated almost one-third of MIVA's revenue during 2003, 2004, and 2005, and represented about 36 percent of MIVA's click revenue ( *id.* ¶¶ 40–41)—began using click fraud to generate revenue. Saveli and Dmitri's click fraud included the use of spyware, browser hijacking software, and other non-human traffic. ( *Id.* ¶ 43). According to a former Business Development Manager at MIVA, Saveli and Dmitri were "turn and burn guys"

who focused primarily on driving in a lot of traffic, regardless of its quality. ( *Id.* ¶ 39). This low-quality traffic caused advertisers to lower their advertising bids, decreasing Company revenue. A former MIVA Account Manager described the result as "serious, serious bid deflation." ( *Id.* ¶ 29).

Due to MIVA's low-quality distribution partners,[4] the Company's revenue-per-click rate dropped from $0.20–$0.21 in early 2003 to $0.12 by June 2005. ( *Id.* ¶ 33). This decrease in revenue had a domino effect, driving away high-quality distribution partners who shared in MIVA's decreasing revenue and thus sought more competitive returns from alternative pay-per-click companies. ( *Id.* ¶ 34). As a result, the Plaintiffs allege that the Company increasingly relied on greedy and unscrupulous distribution partners who were focused on only short-term gain. ( *Id.*)

By the summer of 2005, an analysis of MIVA's affiliates revealed that its supposedly extensive and diversified partner network had shrunk, with 95 percent of the Company's click revenue coming

from its top fifty distribution partners—the top two being Saveli and Dmitri. ( *Id.* ¶ 37). In short, according to the Plaintiffs' allegations, the Defendants had created a distribution network that was primarily fueled by illicit traffic-generating techniques, and, according to a former MIVA Marketing Manager, was best described as a "house of cards ... held together by a thread." ( *Id.*)

Although click fraud is deleterious in the long term because it drives away advertisers, it produces short-term revenue gains through increased clicks. The Plaintiffs allege that the click fraud within MIVA's network enabled the Company to report an uninterrupted string of quarter-by- *1293 quarter financial F.3d 1293 gains. Between 2003 and 2005, the Defendants issued public statements reporting seemingly unstoppable growth stemming from its primary pay-per-click business. ( *Id.* ¶ 2). In fact, prior to February 23, 2005, the Company met or exceeded analyst growth expectations in every single quarter since 2003. ( *Id.*) Perhaps demonstrating the Company's obsession with meeting Wall

Street's forecasts, these expectations were sometimes met by as little as a penny. ( *Id.*) Therefore, the Plaintiffs allege that despite the bid deflation and declining revenues MIVA was actually experiencing, the Defendants allowed click fraud to continue within its network in order to meet analyst growth expectations at the expense of the Company's long-term health. ( *Id.* ¶ 9).

During 2004 and 2005, state and federal regulators' scrutiny of click fraud intensified, causing the Defendants to fear that the "hammer" would be coming down on the spyware industry. ( *Id.* ¶¶ 61–62). In an effort to lull investors and advertisers into believing that the Company was proactive and aggressive about policing click fraud, Defendant CEO Pisaris– Henderson claimed during a Company conference call on February 23, 2005 that, in the fourth quarter of 2004, the Company had voluntarily removed distribution partners representing $70,000 in revenue per day because "our focus is to deliver traffic that converts rather than just clicks alone." ( *Id.* ¶¶ 12, 87, 95).

However, according to the Senior Director of Business Development responsible for the oversight and management of all of MIVA's affiliates, "no traffic was taken off line in the fourth quarter of 2004." ( *Id.* ¶ 88). This Senior Director also said that the announcement in the February conference call clearly referred to Saveli and Dmitri, who earned a combined average of $70,000 in revenue per day. ( *Id.*) Notably, however, Saveli and Dmitri were not removed from the network. ( *Id.*) This fact was corroborated by a former MIVA Marketing Manager who stated that it was "an open secret within the Company that Dmitri and Saveli were not taken off line in December 2004, and neither was anyone else." ( *Id.*)

On March 16, 2005, in a Form 10–K annual report filed with the Securities and Exchange Commission ("SEC"), the Defendants repeated their claim that in the "fourth quarter of 2004, we ceased displaying advertisements with distribution partners ... whose traffic did not adequately convert to revenue for our advertisers," and that "the removal of these distribution

partners reduced our average click-through revenue by approximately $70,000 per day." ( *Id.* ¶ 95). The Company asserted that the removal was in conformity with its "long-stated goal of provided [sic] high quality traffic to our advertisers." ( *Id.*) (alteration in original). In the same 10–K, the Company also affirmatively asserted that "[w]e do not rely on 'spyware' for any purpose and it is not part of our product offerings," that "[w]e have implemented screening policies and procedures to .... detect[ ] fraudulent click-throughs, which are not billed to our advertisers," and that "[w]e have developed automated proprietary screening applications and procedures to minimize the effects of ... fraudulent clicks." ( *Id.* ¶¶ 89, 91).

Before the stock market [5] opened on May 5, 2005, the Company issued a press release announcing disappointing first quarter 2005 results and the resignation of Brenda Agius as CFO. ( *Id.* ¶ 102). Later *1294 that day,     F.3d 1294 Defendants Craig Pisaris–Henderson, the Company's CEO, and Phillip Thune, the Company's COO, revealed to the public that click fraud had indeed been

responsible for some of the Company's revenues, stating in a conference call with analysts and investors that "a couple" of MIVA's distribution partners had been employing "capabilities ... to get additional traffic that just simply don't adhere to our standards." ( *Id.* ¶ 103) (alteration in original). Within a single day of trading on May 5, 2005, MIVA's share price plummeted over 21 percent from the previous day, from a closing price of $6.16 on May 4, 2005, to a closing price of $4.83 on May 5, 2005. ( *Id.* ¶ 104). The stock price continued to drop on Friday, May 6, and Monday, May 9, as the market further digested the Company's click fraud revelations, closing at $4.46 on May 9, 2005. (Hakala Report, at 23 & Ex. C–1).

## C. *Procedural History*

The Plaintiffs filed their initial complaint against the Defendants on May 6, 2005, in the United States District Court for the Middle District of Florida. On July 27, 2005, the district court consolidated five lawsuits against FindWhat (by then known as "MIVA"), and appointed the FindWhat Investor Group as lead

plaintiff. On January 17, 2006, the Plaintiffs filed their First Amended Consolidated Class Action Complaint ("Complaint"), which is the operative pleading on appeal. Styled as a Rule 23(b)(3)[6] class action, the Complaint named MIVA and three individual officers as defendants (CEO Craig Pisaris–Henderson; COO Phillip R. Thune; and former CFO Brenda Agius[7]), and identified eleven allegedly false or misleading statements made by the Defendants in violation of § 10(b) of the Exchange Act,[8] 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[9] (Compl. ¶¶ 134–42).

On March 15, 2007, the district court partially granted the Defendants' motion to dismiss, dismissing as insufficiently pled all claims in the Plaintiffs' Complaint except those relating to statements made by the Defendants on February 23, 2005 and March 16, 2005. *See* *1295 *In re Miva,* F.3d 1295 *Inc., Sec. Litig.,* 511 F.Supp.2d 1242 (M.D.Fla.2007). The district court then certified the class but shortened the class period. *See In re Miva, Inc., Sec. Litig.,* No. 2:05–cv–201, 2008 WL 681755 (M.D.Fla. Mar. 12, 2008). The Plaintiffs had

proposed that the class consist of "all persons or entities who purchased or otherwise acquired the common stock of MIVA between September 3, 2003 and May 4, 2005, inclusive, and who were damaged thereby" (the "Proposed Class Period"). (Compl. ¶ 152). The district court shortened the period to February 23, 2005 through May 4, 2005, inclusive (the "Class Period"), because, pursuant to its prior dismissal order, "the earliest statement or omission on which the plaintiffs could base a claim is February 23, 2005." *In re Miva,* 2008 WL 681755, at *2.

In November 2009, the district court, after referring the matter to a magistrate judge, adopted the magistrate judge's Report and Recommendation and granted final summary judgment in favor of the Defendants on the two remaining misrepresentations, on the grounds that the Plaintiffs had failed to demonstrate triable issues of fact with respect to loss causation and damages. *See In re MIVA, Inc., Sec. Litig.,* No. 2:05–cv–201, 2009 WL 3821146 (M.D.Fla. Nov. 16, 2009). Thereafter, the Plaintiffs timely filed this appeal, challenging both

the district court's dismissal order and the district court's final order of summary judgment.

## II. *Dismissal Order*

We address first whether the Plaintiffs have sufficiently pled a Rule 10b–5 action concerning the Defendants' statements made on March 5, 2004 and July 26, 2004.[10] As for the first statement, we affirm the dismissal, because the Plaintiffs have failed to plead scienter with the requisite specificity; with respect to the second statement, we also affirm the district court's order, because the Plaintiffs have failed to allege that the statement was either false or misleading.

### A. *Legal Standards*

We review a district court's order dismissing a complaint *de novo. Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1236 (11th Cir.2008).

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege:

(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and

(6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

*Id.* at 1236–37 (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).[11] *1296

F.3d 1296

To survive a motion to dismiss, a claim brought under Rule 10b–5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b), *see Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"),[12] *see Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir.2004).

Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). For purposes of this analysis, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield,* 466 F.3d at 1261 (quoting *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1273 n. 1 (11th Cir.1999)).

Federal Rule of Civil Procedure 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *Garfield,* 466 F.3d at 1262; *Ziemba,* 256 F.3d at 1202. Notably, the "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a

complaint." *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1012 (11th Cir.2005) (per curiam).

The PSLRA imposes additional heightened pleading requirements on Rule 10b–5 actions. For Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). And for all private Rule 10b–5 actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id.* § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each

alleged violation of the statute. *Phillips,* 374 F.3d at 1016–18. If

*1297 these PSLRA          F.3d 1297

pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## B. *Analysis*

### 1. *March 5, 2004 Form 10–K Filing*

On March 5, 2004, MIVA filed its Form 10–K annual report with the SEC for the fiscal year ending December 31, 2003. Both Defendants Pisaris–Henderson (CEO) and Thune (COO)[13] signed the form and certified its accuracy pursuant to the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley"). [14] ( *See* MIVA 10–K, filed Mar. 5, 2004, at 41 & Exs. 31.1–32.2). The Plaintiffs point to the following relevant statements found in the 10–K:

The FindWhat.com Network is dedicated to delivering high-quality keyword ads as a result of an Internet user's search query. As such, we have written and strictly enforce advertising guidelines to try to ensure high relevancy standards.

....

... We are dedicated to delivering high-quality traffic to our advertisers' websites. *We employ an integrated system of numerous automated and human processes that continually monitor traffic quality, often eliminating any charges for low quality traffic proactively from the advertisers' accounts. We enforce strict guidelines with our Network partners to ensure the quality of traffic on the system.*

....

Business with Third Parties: We expect that our consultants, agents, resellers, distributors, subcontractors, and other business partners will adhere to lawful and ethical business practices. It is important to our company's reputation that we avoid doing business with companies which violate applicable laws or have reputations which could harm our business. *Our policy prohibits engaging agents or other third parties to do indirectly what we as a company should not do under our own policies outlined in this code.*

(MIVA 10–K, Mar. 5, 2004, at 5, 6 & Ex. 14.2) (emphasis added) (quoted in Compl. ¶¶ 75, 73).[15] *1298 F.3d 1298

The Complaint alleges that these statements are false or misleading for two reasons: first, the Plaintiffs claim that the Defendants violated the stated Company "policy" by allowing its two largest distribution partners—Saveli and Dmitri—to generate click traffic through fraudulent methods (Compl. ¶ 74); and, second, the Plaintiffs allege that the Defendants did not enforce any "strict guidelines" to ensure high-quality traffic—rather, according to the Plaintiffs, the Defendants intentionally ignored and even encouraged illicit practices to generate click traffic ( *id.* ¶ 76).

The district court concluded that these Form 10–K statements were not actionable because they were not misleading. In particular, the court determined that "[s]tatements expressing an expectation of associating with ethical and lawful third-parties does not mean that FindWhat warrants that it does not have current questionable associations." *In re Miva,* 511 F.Supp.2d at 1254. The court also concluded that "a

dedication to high-quality keyword ads and traffic is not inconsistent with the existence of low-quality keyword ads and traffic." *Id.* Moreover, the court found that "the Form consists of mostly forward-looking statements, [which are] protected by the safe harbor provisions of Section 78u–5(c), [because] ... the statements are accompanied by cautionary statements." *Id.; see* 15 U.S.C. § 78u–5(c)(1)(A)(i), (i)(1) (defining "forward-looking statements" as encompassing, *inter alia,* projections of revenues, statements regarding management's future plans and objectives, and statements regarding future economic performance, and providing a "safe harbor" for such statements to the extent that they are identified as forward-looking and are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"); *see generally Bryant,* 187 F.3d at 1276 n. 7 (describing the PSLRA's safe-harbor provision).

We disagree, however, with the district court's view that no portion of the Form 10–K could be considered materially misleading. The Form 10–K contains affirmative statements of present fact—" *[w]e employ* an integrated system ... that continually monitor[s] traffic quality," and " *[w]e enforce* strict guidelines ... to ensure the quality of traffic," (Compl. ¶ 75) (emphases added)— that unquestionably create the impression that MIVA maintains an active and sophisticated monitoring system for screening fraudulent traffic. Accepting the Plaintiffs' allegations as true, these statements are misleading because they could mislead a reasonable investor into believing that the Defendants had systems in place that would detect and remove distribution partners engaged in extensive fraudulent revenue-generating practices, when in truth and in fact they did not. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 863 (2d Cir.1968) (en banc) (holding that a statement is misleading if "in the light of the facts existing at the time of the [statement] ... [a] reasonable investor, in the exercise of due care, would have been misled by it"). To

avoid being misleading, the Defendants' statements triggered a duty to disclose the grave defects that existed within the "enforce[ment]" *1299 system they voluntarily touted. *See SEC v. Merchant Capital, LLC,* 483 F.3d 747, 770–71 (11th Cir.2007) (holding that a duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors); *see also Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986) ("A duty to disclose may … be created by a defendant's previous decision to speak voluntarily."); *First Va. Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977) ("[A] duty to speak the full truth arises when a defendant undertakes to say anything.").[16]

The Defendants' failure to disclose these defects rendered their statements materially misleading, which was not cured by any general cautionary or risk-disclosing language. *See Merchant Capital,* 483 F.3d at 769. The Form 10–K's cautionary language consisted only of general warnings about risks inherent to the Company's business model, and was not "specifically

F.3d 1299

tailored" to risks from click fraud. *See id.* at 768. Indeed, the 10–K disclosed nothing to indicate even potential weaknesses in the Company's click-fraud monitoring systems, much less any information regarding actual known breaches of those systems.[17] As this Circuit has held, "to warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Id.* at 769 (quoting *Rubinstein v. Collins,* 20 F.3d 160, 171 (5th Cir.1994)) (bracket omitted); *see also Rubinstein,* 20 F.3d at 171 ("[T]he inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts."). In addition, because the Defendants' statements purport to represent present facts, the Defendants cannot claim protection under the PSLRA's safe-harbor provision for forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i), (i)(1).

Nonetheless, although we disagree with the ground on which the district court found that the March 5, 2004 Form 10–K filing was non-

actionable—namely, that the statements were not misleading—we affirm the district court's dismissal of the March 5, 2004 Form 10–K statements on the alternative ground that the Plaintiffs have failed to plead scienter adequately with respect to these statements.

Rule 10b–5 requires a plaintiff to show that the defendant made the material misstatement or omission with the requisite culpable state of mind, or scienter. In this Circuit, "scienter consists of intent to defraud or severe recklessness on the part of the defendant." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 594 F.3d 783, 790 (11th Cir.2010) *1300 F.3d 1300 (internal quotation marks omitted). As we have explained,

[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve … an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Mizzaro,* 544 F.3d at 1238 (quoting *Bryant,* 187 F.3d at 1282 n. 18).

As we've noted, the PSLRA explicitly requires that the complaint's allegations create "a *strong* inference" of scienter. 15 U.S.C. § 78u–4(b)(2) (emphasis added). "To qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable —it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). "The inquiry is inherently comparative," as "the court must take into account plausible opposing inferences." *Id.* at 323, 127 S.Ct. 2499. The PSLRA also mandates that the court assess scienter "with respect to each act or omission alleged to violate this chapter." 15 U.S.C. § 78u–4(b)(2); *accord Phillips,* 374 F.3d at 1016 ("[Scienter] must be inferred for each defendant *with respect to each violation.*" (emphasis added)).[18] "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the

inference of scienter at least as strong as any opposing inference?" *Mizzaro,* 544 F.3d at 1239 (quoting *Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499).

The full extent of the Plaintiffs' allegations that could potentially contribute to an inference of scienter by the time of the Defendants' March 5, 2004 10–K statements are these [19]:

• Sometime during the Proposed Class Period—that is, between September 3, 2003 and May 4, 2005, inclusive—Defendant Pisaris–Henderson (CEO) attended a meeting in the Company's fifth floor Executive Conference Room, in which growing internal concern over Saveli and Dmitri's illicit revenue-generating practices was discussed. (Compl. ¶ 54). (The Complaint provides no further information about this meeting.)

• Between September 2003 and May 2004, the Company announced various plans that together would result in the acquisition of four other companies, for a total price of $223.5 million, paid for in part by MIVA's inflated stock. ( *Id.* ¶¶ 129–30).

• In a June 2004 meeting, certain members of the management team decided to terminate the Company's relationship with Saveli and Dmitri because they were "basement operators" who employed spyware. However, Defendants Pisaris–Henderson (CEO) and Thune (COO) ultimately disallowed the termination because of the negative impact it would have had on revenue. ( *Id.* ¶¶ 55–57).

• At some point, a former Director of Business Development at MIVA discussed the need to negotiate relationships with higher-quality affiliates by increasing *1301 distribution partners' F.3d 1301 revenue share from 50 percent to 60 percent, but Defendants Pisaris–Henderson and Thune refused to let him go forward with this plan. ( *Id.* ¶¶ 34–35). (No dates or further information are provided.)

• In or around November 2004, Defendants Pisaris–Henderson and Thune approved an increase in the percentage of revenue paid to partners other than Saveli and Dmitri from 50 percent to 70

percent, in an attempt to dilute the bad traffic coming from Saveli and Dmitri. ( *Id.* ¶ 57).

• During a one-on-one meeting in December 2004 or January 2005, Defendant Pisaris–Henderson asked the former Director of Business Development whether he thought the Company's traffic quality problems had to do with Saveli and Dmitri, and the former Director answered affirmatively. ( *Id.* ¶ 58).

• In the fourth quarter of 2004, three company insiders (including Defendants Pisaris–Henderson and Thune) sold some of their Company stock, totaling roughly $7 million in sales. ( *Id.* ¶¶ 117–20). None of these individuals sold any stock in 2003 or 2005. ( *Id.* ¶ 119).

• On February 21, 2005, an internal company e-mail was sent saying, "There was a large increase in traffic coming thru Saveli, [Dmitri], [and two other distribution partners]—Can we make sure that this additional traffic was valid?" The e-mail also indicated that much of the traffic was being generated through pornographic websites, which is an indicator of click fraud. [20] ( *Id.* ¶¶ 47–48).

• Every Thursday, the Company's executive management team received "War Reports" from the Company's Business Development unit. ( *Id.* ¶ 51). The Business Development unit then met every Friday at 10:00 a.m. to discuss executive management's response to the War Reports, as well as pending deals, prospective deals, and current relationship issues, such as unscrupulous Internet traffic. ( *Id.*) (No dates or further details regarding the War Reports are provided.)

• The Defendants maintained an internal computer system called the "Interface" from which executive management could view the Company's Internet traffic in "real-time." ( *Id.* ¶ 52). The Interface displayed legitimate Internet traffic in blue and illegitimate traffic in red. ( *Id.* ¶ 53). (No further details are provided regarding the "Interface" system.)

• At some point, Saveli and Dmitri were generating revenue-per-click rates in excess of $0.40, when the Company's average rate was approximately $0.12. ( *Id.* ¶ 59). Indeed, at least twenty-seven other distribution partners were generating rates that were similarly

"outside the expected or normal range" and indicative of "surreptitious traffic." ( *Id.* ¶ 60). Such high revenue-per-click rates suggested that the affiliates were using spyware programs to generate clicks on only the highest-bid keywords.[21] ( *Id.* ¶ 59). *1302

F.3d 1302

• It was "commonly known" within the Company that Saveli and Dmitri relied on click fraud, such as browser hijacking. ( *Id.* ¶ 45).

• The Defendants were highly motivated to hide their reliance on fraudulent, low-quality click traffic because they desperately needed the funds from Saveli and Dmitri in order to meet Wall Street's demanding revenue goals. ( *Id.* ¶¶ 32, 35, 38, 57, 123–31).

After reviewing all of the Plaintiffs' allegations relating to scienter, we agree with the district court that "[t]he earliest possible date which can be ascertained from the Amended Complaint [on which the Defendants knew, or were severely reckless in not knowing, of the alleged fraudulent revenue-generating scheme] was June 2004, when a meeting took place to discuss the termination of Saveli

and Dmitri." *In re Miva,* 511 F.Supp.2d at 1252. Even viewing all of the Plaintiffs' allegations in concert, the Complaint contains no allegations from which we can infer that anyone in MIVA's management knew or "must have" known about the click fraud before June 2004. *See Mizzaro,* 544 F.3d at 1238.

Not only do the Plaintiffs fail to allege any direct evidence that the Defendants knew about MIVA's click fraud problems before the June 2004 meeting, but none of the Plaintiffs' circumstantial allegations of knowledge relate to the time period before June 2004 either. The internal e-mail regarding pornographic websites was not sent until February 2005. (Compl. ¶¶ 47–48). The alleged insider trading did not occur until the fourth quarter of 2004. ( *Id.* ¶¶ 117–20). The revenue-split increase from 50 percent to 70 percent intended to dilute illicit traffic did not occur until roughly November 2004. ( *Id.* ¶ 57). And other allegations, including those regarding the "Interface" computer system, ( *id.* ¶¶ 52–53), Saveli and Dmitri's excessively high revenue-

per-click rates, ( *id.* ¶¶ 59–60), and the weekly War Reports, ( *id.* ¶ 51), are undated entirely.

The Plaintiffs admit that the Complaint only provides dates for relevant events occurring in June 2004 or thereafter. (Appellant Br. at 34). However, the Plaintiffs argue that "those interactions with Defendants detail their acknowledgment of an *ongoing* problem, not one that had suddenly surfaced." ( *Id.*) The Plaintiffs assert that, "if a decision *had already been made* in June 2004 to remove Saveli and Dmitri as distribution partners because of their reliance on click fraud," the Defendants *must have* known of the problem before that. ( *Id.*)

This claim is wholly speculative. It is equally plausible that management made the decision to terminate Saveli and Dmitri immediately upon learning of their reliance on click fraud. In addition, the Plaintiffs are necessarily asking the court to project the Defendants' presumed knowledge of click fraud a full three months into the past, to the time of the March 5, 2004 Form 10–K filing. Even if the Defendants' interactions suggest that the June 2004 meeting was not the first time

management learned of MIVA's click fraud problems, there are no facts, much less *any* that are pled with particularity, demonstrating that the Defendants had such knowledge a full three months earlier. *Cf. Mizzaro,* 544 F.3d at 1250–51 ("[W]e indulge at least some skepticism about allegations that hinge entirely on a theory that senior management 'must have known' everything that was happening…. The … complaint … must at least allege *some* facts showing how knowledge of the fraud would or should have percolated up to senior management."). \*1303    F.3d 1303

The Plaintiffs' other allegations are simply insufficient to support a strong inference of scienter. Their allegations regarding the "Interface" computer system are insufficiently particularized, because they fail to indicate when the computer system became available; which executives accessed it; how they accessed it and how often; whether it was installed on a single computer or was available on a network; whether there were any policies regarding its use; or even what its purpose was. *Cf. id.* at 1242

(finding allegations regarding a strategic operating plan insufficiently particularized where the complaint "[did] not explain who wrote it, how it was distributed to employees, or who received it"); *Garfield,* 466 F.3d at 1265 (concluding that allegations about what was said at a meeting involving senior executives was insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context"). Without any allegations that the Defendants could and did access the "Interface" system before March 2004, and indicating what they would have seen had they done so, it is impossible to draw the requisite "strong inference" of scienter, 15 U.S.C. § 78u–4(b)(2)—that is, one that is "cogent" and "compelling," *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499.

Similarly, the Plaintiffs' allegation that it was "commonly known" within the Company that Saveli and Dmitri relied on click fraud, (Compl. ¶ 45), is conclusory and plainly lacks sufficient particularity to create a strong inference of scienter. *See Thompson,* 610 F.3d at 634 ("[C]onclusory allegations

are insufficient to establish a 'strong inference that the defendants acted with the required state of mind.' " (quoting *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499)).

The Defendants' alleged motives to meet Wall Street's revenue expectations are also insufficient to establish scienter. We have rejected the notion that "allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit." *Bryant,* 187 F.3d at 1285; *see also Thompson,* 610 F.3d at 689 (Tjoflat, J., concurring in the appeal and dissenting in the cross-appeal) ("It stands to reason, of course, that a company's officers and directors have a motive to commit securities fraud. But that could be said of any public company's officers and directors, which is why the precedent of this circuit squarely forecloses any argument that stand-alone allegations of 'motive and opportunity' will satisfy the PSLRA's standard.").

In addition, because scienter analysis is comparative, we note the alternative inferences that arise from the Complaint's allegations (and apparent omissions). First, if

click fraud were so dramatically driving down traffic quality in early 2004, it might be expected that advertisers would have complained to MIVA about the diminishing conversion rates they were experiencing, thereby bringing the problem to management's attention. However, despite the Plaintiffs' access to numerous management-level employees, including a former Director of Business Development "primarily responsible for the development and maintenance of distribution partner relationships," (Compl. ¶ 40), the Complaint makes no mention of even a single advertiser who complained about low conversion rates. *Cf. Mizzaro,* 544 F.3d at 1253 ("[T]he … complaint makes no mention of even a single vendor who complained to anyone at Home Depot [about allegedly widespread return-to-vendor fraud], let alone complained to senior management.").

Second, the Plaintiffs neglect to provide even approximate dates for numerous allegations, despite the allegations' otherwise detailed nature. Thus, for example, no approximate date is offered for the allegation *1304 that Saveli F.3d 1304

and Dmitri—and at least twenty-seven other distribution partners—were generating excessively high revenue-per-click rates, even though the data is otherwise comprehensive, including each affiliate's name, FindWhat ID number, and precise revenue-per-click amount. (Compl. ¶¶ 59–60). Similarly, the Plaintiffs do not indicate even an approximate date (apart from alleging that it occurred sometime within the twenty months constituting the Proposed Class Period) for the meeting Defendant Pisaris–Henderson attended in the fifth floor Executive Conference Room in which growing internal concern over Saveli and Dmitri's illicit revenue-generating practices was discussed. ( *Id.* ¶ 54). The inference that the Plaintiffs' sources were wholly unable to remember even approximate dates for these events, despite recalling otherwise detailed content, is less strong than the inference that the Plaintiffs or their sources omitted such dates strategically after concluding that the information would not be helpful to their allegations. "[O]missions and ambiguities

count against inferring scienter." *Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499.

Finally, despite having access to a former Manager of Business Development who was allegedly involved in providing the weekly War Reports to the executive management team, the Plaintiffs have failed to allege even a single instance in which click fraud was discussed in the War Reports. ( *See* Compl. ¶ 51). This glaring omission raises an inference that such fraud was not in fact discussed.

Therefore, even though the March 5, 2004 statements may have been materially misleading, the Plaintiffs have not alleged sufficient facts to yield a strong inference of *scienter* on or before that date. We, therefore, affirm the district court's dismissal of all claims predicated on this statement.

## 2. *July 26, 2004 Conference Call*

On July 26, 2004, MIVA held a public conference call to discuss financial results for the second quarter of 2004.[22] On the call,

Defendant Thune (COO) commented on revenue trends for the Company this way:

While both our revenue and Espotting's revenue in April was down versus January, *by June revenue was increasing. And we believe that every one of our divisions can grow revenue from Q2 to Q3,* despite the seasonal softness typical in the summer months, when individual Internet usage usually declines. In part, this revenue growth will come from executing on opportunities created by the four transactions we have completed this year.(Compl. ¶ 78) (some emphasis omitted).

To begin with, Thune's statement that "we believe that every one of our divisions can grow revenue from Q2 to Q3" is non-actionable. Statements regarding *future* performance are actionable only if "they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them." *Merchant Capital,* 483 F.3d at 767 (internal quotation marks and alteration omitted). There are no allegations in the Complaint suggesting any of these possibilities.

Therefore, the only potentially actionable part of Thune's statement is the factual claim that "by June revenue was increasing." (Compl. ¶ 78). Nowhere in the Complaint, however, do the Plaintiffs allege that this statement was inaccurate, *1305 i.e., F.3d 1305 that revenue was not increasing by June 2004. Indeed, on appeal, the Plaintiffs effectively concede that this statement was not false. Instead, the Plaintiffs argue that the statement was misleading because it was only a half-truth, suggesting that "[t]he portrayal of MIVA as a growth company with increasing revenue was highly misleading because [the] Defendants knew their revenue stream included the illicit click-fraud operators who counted for a significant portion of the Company's purported financial growth." [23] (Appellant Reply Br. at 6).

Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). By

voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (en banc) (quoting *Texas Gulf Sulphur,* 401 F.2d at 862); *accord Rudolph,* 800 F.2d at 1043 ("Where a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive, a duty to disclose arises."); *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 248 (5th Cir.2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *In re K-tel Intern., Inc. Sec. Litig.,* 300 F.3d 881, 898 (8th Cir.2002) (internal quotation marks and alteration omitted). In sum, "a defendant may not deal in half-truths." *First Va. Bankshares,* 559 F.2d at 1314.

A statement is misleading if "in the light of the facts existing at the time of the [statement] ... [a] reasonable investor, in the exercise of due care, would have been misled by it." *Texas Gulf Sulphur,* 401 F.2d at 863. Thus, the "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.* at 862.

According to the Plaintiffs, because the Defendants "failed to disclose that the only reason for the purported 'increase' [in revenue] was the inclusion of illegitimate traffic, which would inevitably have to be removed," Defendant Thune's statement was fatally misleading. (Appellant Br. at 24). However, the Plaintiffs' argument fails. Requiring that disclosures be " 'complete and accurate' ... does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Backman,* 910 F.2d at 16. A corporation has a duty to neutralize only the "natural and normal implication" of its statements. *See* Donald C. Langevoort, *1306 Half–Truths: Protecting

F.3d 1306

Mistaken Inferences by Investors and Others, 52 Stan. L.Rev. 87, 94 (1999).

Defendant Thune's statement would be misleading only if it "conveyed to the public a false impression" of the quality of the Company's click traffic. *See Texas Gulf Sulphur,* 401 F.2d at 862. However, Defendant Thune's statement—a general report about an actual increase in total revenue in the preceding month across the Company as a whole, which at that time included MIVA's recently acquired companies, as well—conveyed no message regarding the underlying quality of MIVA's click traffic. Thune's statement did not even mention MIVA's click traffic or click revenue. No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future. Otherwise, factual reporting of past earnings—disclosure of which the securities laws always encourage and frequently require[24] —would become a treacherous endeavor indeed. Under the

Plaintiffs' preferred rule, company reports of revenue growth—no matter how factually accurate and no matter the level of generality—would be made at the company's peril, carrying a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future revenue. This is not the rule. "Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 538 (3d Cir.1999); *see also Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy...."). Defendant Thune's statement—a factually accurate report regarding total revenue growth across the Company as a whole—did not create a false impression about MIVA's click fraud problems and, therefore, was not misleading under the circumstances. *See* 17 C.F.R. § 240.10b–5(b).

Because Thune's statement made during the July 26, 2004 conference call was neither false nor misleading, the district court was correct to conclude that the statement could not supply a basis for liability, and thus to dismiss as non-actionable all claims relying on it.

## III. *Summary Judgment Order*

The Defendants' summary judgment motion raised the issue of whether, through the report of their expert, economist Scott D. Hakala, Ph.D., C.F.A., the Plaintiffs have demonstrated genuine issues of material fact as to loss causation and damages—two necessary elements of a Rule 10b–5 action. The district court concluded as a matter of law that Dr. Hakala's report did not create triable issues of fact concerning either loss causation or damages because Hakala himself acknowledged that MIVA's stock price was inflated by 26.44 percent *before* the Defendants' first actionable misrepresentation, and remained inflated at that same level *after* the Defendants made the two allegedly actionable misstatements on

February 23, 2005 and March 16, 2005. The court reasoned that because the inflation level in MIVA's stock price did not change as a result of the alleged misrepresentations, *1307  F.3d 1307 these otherwise actionable statements by the Defendants could not have "caused" the Plaintiffs' losses.

This ruling constituted legal error. The Defendants may be held liable for knowingly making materially false statements that continued to prop up the already inflated price of MIVA's stock and thereby caused losses to investors, regardless of whether MIVA's stock price was already inflated before the actionable statements were made. Investors who purchased MIVA stock at inflated prices during the Class Period—and, notably, after the purportedly fraudulent statements were made—may have sustained substantial losses that they would not have suffered had the Defendants revealed the truth at the start of the Class Period. As a result of its incorrect legal premise about the significance of pre-Class Period inflation, the district court did not attempt to evaluate the Plaintiffs' evidence to determine whether it created questions of fact necessitating a trial. Accordingly, we vacate the district court's summary judgment ruling and remand for the district court to address the motion measured against the correct legal standard.

## A. *Standard of Review*

We review the district court's grant of summary judgment *de novo. Norfolk S. Ry. Co. v. Groves,* 586 F.3d 1273, 1277 (11th Cir.2009). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over such a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In making this determination, we view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Johnson v. Booker T. Washington Broad. Serv., Inc.,* 234 F.3d 501, 507 (11th Cir.2000). <mark>On summary judgment, a court may not weigh conflicting evidence or make credibility determinations of its own.</mark> *Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). If the record presents disputed issues of fact, the court may not decide them; rather, it must deny the motion and proceed to trial. *Tullius v. Albright,* 240 F.3d 1317, 1320 (11th Cir.2001).

## B. *Statements at Issue*

Only two of the Defendants' allegedly false or misleading statements were found on the pleadings to be actionable by the district court so as to survive the Defendants' motion to dismiss: (1) a February 23, 2005 conference call, and (2) a March 16, 2005 Form 10–K filing.

The first allegedly actionable misstatement occurred on February 23, 2005, when Defendant Pisaris–

Henderson (CEO) participated in a public conference call and said the following:

In fact, during Q4, we intentionally removed numerous traffic sources that would otherwise have produced approximately $70K revenue per day....

Let me repeat, we have intentionally removed traffic sources from our distribution network that would otherwise have produced approximately $70K per day in top line revenue. Again, our focus is to deliver traffic that converts rather than just clicks alone.

(Dkt. 39–9, Ex. F, at 17–18) (quoted in Compl. ¶ 87). The Plaintiffs allege that, in *1308 fact, no distribution partners F.3d 1308 were removed from the MIVA network in the fourth quarter of 2004. (Compl. ¶ 88).

The second of the allegedly actionable fraudulent statements was made in MIVA's Form 10–K annual report filed with the SEC on March 16, 2005. The 10–K was signed by Defendants Pisaris–Henderson (CEO) and Thune (COO), and its accuracy was

certified pursuant to Sarbanes–Oxley by Pisaris–Henderson and then-CFO Brenda Agius. ( *See* MIVA 10–K, filed Mar. 16, 2005, at 64 & Exs. 31.1–32.2). In the 10–K, the Company made the following relevant statements about click fraud:

We do not rely on "spyware" for any purpose and it is not part of our product offerings....

....

From time to time, we receive fraudulent clicks on our ads.... We have implemented screening policies and procedures to minimize the effects of these fraudulent clicks. We believe that these policies and procedures assist us in detecting fraudulent click-throughs, which are not billed to our advertisers.

....

... We have developed automated proprietary screening applications and procedures to minimize the effects of these fraudulent clicks.

(MIVA 10–K, filed Mar. 16, 2005, at 17, 20, 44) (quoted in Compl. ¶¶ 89, 91).

The Form 10–K also made the following representations regarding MIVA's distribution partners:

Expressed as a percentage of revenue, none of the traffic purchased from any of [MIVA's] distribution partners represented over 10% of consolidated revenue in 2004....

In the second half of the fourth quarter of 2004, we ceased displaying advertisements with distribution partners and affiliates of distribution partners whose traffic did not adequately convert to revenue for our advertisers.... Measured at the end of the fourth quarter, the removal of these distribution partners reduced our average click-through revenue by approximately $70,000 per day.... We plan to continue our efforts to provide our advertisers with high quality Internet traffic.... We consider the removal of these distribution partners in the second half of the fourth quarter as ordinary to our business and in conformity with our long-stated goal of provided [sic] high quality traffic to our advertisers.

(MIVA 10–K, filed Mar. 16, 2005, at 43–44) (quoted in Compl. ¶¶ 93, 95). The Plaintiffs allege that, in fact, MIVA's network heavily relied on spyware and other forms of click fraud to generate revenues, that almost one-third of MIVA's 2004 revenue came from the illegitimate traffic generated by Saveli and Dmitri, and, again, that MIVA did not remove any distribution partners from its network in the fourth quarter of 2004. (Compl. ¶¶ 90, 92, 94, 96).

Under the Plaintiffs' theory of the case, the Defendants' statements on February 23, 2005 and again on March 16, 2005 were materially misleading because the Defendants knowingly omitted information regarding the Company's significant click fraud problems and resultant bid deflation (i.e., that MIVA's advertisers were bidding less and less for clicks on their ads), and disclosure of this omitted information was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *cf. Schleicher v. Wendt,* 618 F.3d 679, 684 (7th Cir.2010) ("[T]he [alleged]

fraud ... was the omission from public [disclosures] of information ..., at a time when the omission of this news made other statements misleading or incomplete...."). The Plaintiffs claim that the Defendants knowingly and intentionally continued to withhold *1309 from the market the truth about F.3d 1309 click fraud until May 5, 2005, when the Defendants finally revealed in a conference call that "a couple" of MIVA's distribution partners had been employing "capabilities ... to get additional traffic that just simply don't adhere to our standards" (Compl. ¶ 103), at which time MIVA's share price precipitously dropped.

Because the Defendants' summary judgment motion contested only the elements of loss causation and damages, we accept (for present purposes only) the Plaintiffs' allegations concerning the other elements of their Rule 10b–5 claim —that is, that the Defendants made (1) materially false or misleading statements or omissions (2) with scienter, (3) upon which the Plaintiffs relied (4) in purchasing securities. Thus, for present purposes, our loss causation analysis assumes that the

Defendants had a duty to reveal the truth about MIVA's click fraud as early as February 23, 2005 in order to prevent the statements they made during the Class Period from being materially misleading. [25]

## C. *Loss Causation in a Fraud–on–the–Market Case*

The loss causation element of a Rule 10b–5 claim requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses. *In re Omnicom Group, Inc. Sec. Litig.,* 597 F.3d 501, 510 (2d Cir.2010); *see also Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683, 685 (7th Cir.1990) (calling loss causation simply "an exotic name" for "the standard common law fraud rule" requiring the plaintiff to prove both factual and legal causation); 4 Thomas Lee Hazen, Law of Securities Regulation § 12.11 (6th ed. 2009) (section cited with approval in *Dura,* 544 U.S. at 342, 125 S.Ct. 1627) ("Causation in securities law involves the same analysis of cause in fact and legal cause that was developed under the common law."); *cf. Dura,* 544 U.S. at 344–

45, 125 S.Ct. 1627 (noting "common-law roots of the securities fraud action" and basing loss causation analysis on common-law tort causation). The plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses. *Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627; *Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989). However, the plaintiff need not show that the defendant's misconduct was the "sole and exclusive cause" of his injury; he need only show that the defendant's act was a "substantial" or "significant contributing cause." *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997) (quoting *Bruschi,* 876 F.2d at 1531).

The Plaintiffs' claims here rely on a fraud-on-the-market theory of causation. Fraud-on-the-market claims derive from  *1310    F.3d 1310  the so-called efficient market hypothesis, which provides, in the words of the Supreme Court, that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *See Basic,* 485 U.S. at

241, 108 S.Ct. 978 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986)). Because "millions of shares chang[e] hands daily," *id.* at 243, 108 S.Ct. 978, and a critical mass of "market makers" study the available information and influence the stock price through trades and recommendations, *id.* at 248, 108 S.Ct. 978, an efficient capital market rapidly and efficiently digests all available information and translates that information into "the processed form of a market price," *id.* at 244, 108 S.Ct. 978. A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price. This is so because the market has already digested that information and incorporated it into the price. *See Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 665–66 (5th Cir.2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

A "fraud on the market" occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market.

*Basic,* 485 U.S. at 247, 108 S.Ct. 978. Just as an efficient market translates all available *truthful* information into the stock price, the market processes the publicly disseminated *falsehood* and prices it into the stock as well. *See id.* at 241–42, 243–44, 246–47, 108 S.Ct. 978. The market price of the stock will then include an artificial "inflationary" value—the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation. So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day. If and when the misinformation is finally corrected by the release of truthful information (often called a "corrective disclosure"), the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price. That is, the inflation within the stock price will "dissipate."

In a fraud-on-the-market case, the Supreme Court allows the reliance element of a Rule 10b–5 claim to be rebuttably presumed, so long as the defendant's fraudulent misstatement was material and the market was informationally efficient. *See id.* at 247, 108 S.Ct. 978 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b–5 action."). This presumption follows directly from the efficient market hypothesis. Because an informationally efficient market rapidly and efficiently translates public information into the security's price, the market price will reflect the defendant's fraudulent statement, and everyone who relies on the market price as a reflection of the stock's value in effect relies on the defendant's misrepresentation. [26]*Id.* at 241, 108 S.Ct. 978; *see also Peil,* 806 F.2d at 1161. "Misleading statements will therefore defraud purchasers of *1311 stock even if the purchasers do not directly rely on the misstatements."[27]*Basic,* 485 U.S. at 241–42, 108 S.Ct. 978 (quoting *Peil,* 806 F.2d at 1160).

F.3d 1311

While reliance focuses on the front-end causation question of whether the defendant's fraud induced or influenced the plaintiff's stock purchase, loss causation provides the "bridge between reliance and actual damages." *In re Cooper Cos. Sec. Litig.,* 254 F.R.D. 628, 638 (C.D.Cal.2009). In a fraud-on-the-market case—where the plaintiff's claim is generally not that the initial investment transaction would not have occurred at all without the fraudulent misrepresentation, but only "that it would have occurred at a different price," Hazen, *supra,* § 12.11—loss causation requires proof that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff. *See Robbins,* 116 F.3d at 1448 (holding that loss causation requires plaintiffs to show that the "price inflation was removed from the market price of [the] stock, causing plaintiffs a loss"). In other words, proof of a fraudulently inflated purchase price only satisfies reliance; loss causation requires going a step further to supply "the logical link between the inflated share purchase price and any later

economic loss." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627; *see also Robbins,* 116 F.3d at 1448–49 (explaining that an inflated purchase price supports a finding of reliance, but not loss causation).

Plaintiffs frequently demonstrate loss causation in fraud-on-the-market cases circumstantially, by: (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud);[28] (2) showing that the stock price dropped soon after the corrective disclosure; *1312 and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop. *See In re Williams,* 558 F.3d at 1137 ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops—assuming, of course, that the plaintiff could isolate the effects from any other intervening causes

that could have contributed to the decline."); *Lentell,* 396 F.3d at 175 ("[Loss causation is adequately pled by alleging] that the market reacted negatively to a corrective disclosure regarding the falsity of [the defendant's prior statements].").[29] Thus, loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses? *See Dura,* 544 U.S. at 347, 125 S.Ct. 1627 (indicating that the plaintiffs—who alleged that they had purchased stock at an inflated price—would have successfully alleged loss causation if their pleading had also claimed that "[the company]'s share price fell significantly after the truth became known").

## D. *Application to the Plaintiffs' Evidence*

In opposing summary judgment, the Plaintiffs relied on the expert report of Dr. Hakala as evidentiary support for both loss causation and damages. The Defendants expressly assumed the admissibility of Dr.

Hakala's report for purposes of their summary judgment motion.[30] (Dkt. *1313 155, at 6). Dr. F.3d 1313 Hakala conducted an "event study" to demonstrate loss causation and to estimate damages. (Hakala Report, at 5–6, 10–11). "An event study ... is a statistical regression analysis that examines the effect of an event[, such as the release of information,] on a dependent variable, such as a corporation's stock price."[31]*United States v. Schiff*, 602 F.3d 152, 173 n. 29 (3d Cir.2010) (internal quotation marks and alteration omitted). As acknowledged by the Defendants' expert, event studies are a "common method" of establishing loss causation, "used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price." (Dkt. 153–7, at 3–5, ¶¶ 9–11).

Through his event study, Dr. Hakala concluded that MIVA's stock price was inflated by 26.44 percent before and throughout the Class Period due to the false information in the marketplace that MIVA did not rely on click fraud to boost revenues. Dr. Hakala also

concluded through his event study that immediately after the Company finally revealed the truth about its heavy reliance on click fraud on May 5, 2005—admitting in an investor conference call that "a couple" of MIVA's distribution partners had been employing "capabilities ... to get additional traffic that just simply don't adhere to our standards" (Compl. ¶ 103)— the inflation in MIVA's stock price dissipated, causing substantial losses to Class Period investors. (Hakala Report, at 7, 23–24, 29, Ex. B–1 at 9–10; Hakala Dep., at 58:2–4; Hakala Dec., Dkt. 172–1, at 3). Dr. Hakala excluded other possible explanations for the price drop following the May 5, 2005 disclosure, concluding that "the primary if not exclusive reason for the [price] drop [on May 5–9, 2005] was related to ... the subject matter of the fraud.... [T]he confounding information in my analysis could not account for the drop—did not account for the drop...." (Dkt. 153–6, at *1314 17 (Hakala Dep., at 58:2–19)).F.3d 1314 Reasoning that Class Period investors would not have suffered those losses if the Company had disclosed the truth at the beginning of the Class Period instead of at the

end, Dr. Hakala estimated total Class Period damages to be $22.24 million. (Hakala Report, at 28–31).

Even though the Plaintiffs purported to demonstrate that the market substantially devalued MIVA stock upon learning the truth about the Company's click fraud woes on May 5, 2005—a devaluation that the Plaintiffs claim would have occurred at the start of the Class Period if only the truth had been revealed then—the district court concluded that the Plaintiffs' evidence was insufficient as a matter of law to demonstrate loss causation and damages. The district court explained its reasoning this way: "Dr. Hakala testified that the full amount of the alleged price inflation of the stock—26.44%—existed … more than a year before either of the[se] statements …, and remained at that level after the statements at issue. Thus, the evidence from plaintiff establishes that the inflation in the stock price was caused by statements made prior to the class period in this case." *In re MIVA,* 2009 WL 3821146, at *5. In other words, the basic logic underlying the district court's grant of summary judgment is that, because

the inflation in MIVA's stock price predated the Class Period, the statements made by the Defendants during the Class Period—even if knowingly and materially false or misleading—could not have "caused" the inflation, and therefore could not have "caused" the Plaintiffs' losses. This reasoning misapprehends the nature of market fraud.[32]

The district court erroneously assumed that simply because confirmatory false statements have no immediate effect on an already inflated stock price in an efficient market, these statements cannot cause harm. But the inflation level need not change for new investors to be injured by a false statement. Fraudulent statements that *prevent* a stock price from falling can cause harm by *prolonging* the period during which the stock is traded at inflated prices. We therefore hold that confirmatory information that wrongfully *prolongs* a period of inflation—even without increasing the *level* of inflation—may be actionable under the securities laws.[33] That is, *1315    F.3d 1315 defendants can be liable for knowingly and intentionally causing a stock price to *remain*

inflated by preventing preexisting inflation from dissipating from the stock price. *See Schleicher,* 618 F.3d at 683–84 ("[Defendants are liable for securities fraud regardless of whether their] false statements (or ... material omissions) propel the stock's price upward ... [or] were designed to slow the rate of fall.").

At bottom, it is irrelevant to securities fraud liability that the stock price was already inflated before a defendant's first actionable misrepresentation; fraudulent misstatements that prolong inflation can be just as harmful to subsequent investors as statements that create inflation in the first instance. Inflation creates an ongoing risk of harm. Every investor who purchases at an inflated price—whether at the beginning, middle, or end of the inflationary period—is at risk of losing the inflationary component of his investment when the truth underlying the misrepresentation comes to light. Investors who quickly resell their stock during the inflationary period generally will not suffer any economic loss from the fraud, because, although they overpaid for their stock, they can recoup the amount they overpaid by selling at the same inflated price. *See Dura,* 544 U.S. at 342, 125 S.Ct. 1627 ("[I]f ... [a] purchaser sells the shares ... before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). When the truth underlying the falsehood is finally revealed, however, the market will digest the new information and cease attributing the artificial inflation to the price. At that time, investors who purchased at inflated prices (and who still hold their stock) will suffer economic loss, *1316 because they will no F.3d 1316 longer be able to recoup the inflationary component of their purchase price by reselling their stock in the newly calibrated marketplace. *See Schleicher,* 618 F.3d at 684 ("People who buy the stock after the [fraudulent] announcement, and before the truth comes out, pay too much; they will lose money when the [concealed] bad news emerges.").

Because thousands of shares of stock are purchased each day, the longer that inflation remains within a stock price, the more shares that are purchased at inflated prices, and the more shares that stand to

lose when the inflation subsequently dissipates from the price. Clearly then, a falsehood that endures within the marketplace for a longer period of time, all else being equal, will cause greater harm than one that endures for a shorter period of time. There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation. *See In re Cooper,* 691 F.Supp.2d at 1116 (denying summary judgment to defendants on loss causation grounds on the basis that "it [was] disputed as to whether the [defendants'] statements caused artificial inflation *to continue to be incorporated into the stock price,* as opposed to revealing the truth, which allegedly would have caused the stock price to fall" (emphasis added)); *In re Scientific Atlanta, Inc. Sec. Litig.,* 754 F.Supp.2d 1339, 1380 n. 12 (N.D.Ga.2010) ( "Plaintiffs argue persuasively that the class period inflation includes ... the pre-class period inflation that would have been removed from the stock price had [the company] accurately provided information about [the relevant truth at the

start of the class period]."); *In re Bristol–Myers Squibb Sec. Litig.,* No. Civ.A. 00–1990(SRC), 2005 WL 2007004, at *17 (D.N.J. Aug. 17, 2005) (stating, in the materiality context, that "it is conceivable that [an affirmative] misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further").[34]

According to the Plaintiffs, MIVA's stock price was already inflated before the Class Period because the market erroneously believed that MIVA did not rely on click fraud to boost revenues. The Plaintiffs allege that this information was materially false; in fact, MIVA suffered from rampant click fraud. According to the Plaintiffs, the Defendants had a duty to disclose the corrective truth about MIVA's click fraud problems at the start of the Class Period. If the Defendants had revealed the truth then, the market would have digested this information and the artificial inflation within MIVA's stock price would have dissipated. Instead, the Plaintiffs allege, the Defendants wrongfully continued to withhold this material truth from the market

by making knowingly false or misleading statements to the public on February 23, 2005 and March 16, 2005, in which they failed to disclose the extent of MIVA's reliance on click fraud and even affirmatively misrepresented that MIVA actively policed click fraud and "d[id] not rely on 'spyware' for any purpose." ( *See* Compl. ¶¶ 89, 91). According to the Plaintiffs, in so doing, the Defendants' statements caused the market to continue to *1317      F.3d 1317 overvalue MIVA's stock, based on its mistaken belief that MIVA did not rely on click fraud.[35]

Meanwhile, each day that MIVA's stock price remained purportedly inflated, investors purchased thousands of shares of MIVA stock at inflated prices. These investors thus "overpaid" for MIVA stock based on the false information that MIVA did not rely on click fraud to generate Internet traffic. When the alleged truth about MIVA's click fraud was revealed to the market on May 5, 2005, each of those investors who still held his stock lost the inflationary component of his purchase price—at that time, the market ceased attributing inflation to the stock, and investors who had purchased at inflated prices were no longer able to recoup their overpayment by reselling their stock in the marketplace. Therefore, investors who purchased MIVA stock during the Class Period and still held their stock when the truth came out at the end of the Class Period paid inflated prices for their investment —prices they would not have paid but for the defendant's purported fraud—and lost this inflationary overpayment when the revelation of the truth caused the market to drain the inflation from the stock price.

The securities laws do not immunize defendants who knowingly disseminate materially false or misleading information simply because their fraud concerns false information already believed by the market. Defendants whose fraud *prevents* preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance. We decline to erect a *per se* rule that, once a market is already misinformed about a particular truth, corporations are free to knowingly and intentionally

reinforce material misconceptions by repeating falsehoods with impunity. Defendants who commit fraud to prop up an already inflated stock price do not get an automatic free pass under the securities laws.

## IV. *Conclusion*

In short, we affirm the district court's order dismissing the Plaintiffs' claims regarding the Defendants' March 5, 2004 and July 26, 2004 statements. However, as for the Plaintiffs' claims arising from the Defendants' February 23, 2005 and March 16, 2005 statements, we vacate the district court's order granting summary judgment to the Defendants, and remand the case for the district court to consider in the first instance whether the Plaintiffs have demonstrated triable issues of fact regarding loss causation and damages.

**AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.**

---

* Honorable Marcia G. Cooke, United States District Judge for the Southern District of Florida, sitting by

designation.

---

[1.] In June 2005, FindWhat.com, Inc. changed its name to MIVA, Inc. MIVA, Inc. then changed its name to Vertro, Inc. in 2009. This opinion interchangeably uses "MIVA," "FindWhat," and "the Company" to refer to the Defendant company.

---

[2.] The three officers are the Chairman of the Board of Directors and Chief Executive Officer ("CEO") Craig Pisaris–Henderson; President and Chief Operating Officer ("COO") Phillip R. Thune; and former Chief Financial Officer ("CFO") Brenda Agius. (Compl. ¶¶ 19–21).

---

[3.] According to the Plaintiffs' Complaint, "spyware" is software that sabotages a computer's operation for the benefit of a third party. (Compl. ¶ 43 n. 11). "Browser hijacking" occurs when someone "hijacks" the Internet browser of an unknowing computer user and automatically directs the user to unsolicited advertisements, thereby creating a click (or revenue event) for MIVA and the distribution partner. ( *Id.* ¶ 45). "Bots" or "spiders" are computer programs that search the Internet for revenue opportunities and then click on those opportunities. ( *Id.* ¶ 44). "Non-human traffic" creates the appearance that human users are clicking on an advertisement, when in fact, no human prospective customer is viewing the ad. ( *Id.* ¶ 46).

4. Although Saveli and Dmitri generated the most bad-quality traffic, the Plaintiffs allege that MIVA's click fraud problems extended to other distribution partners in MIVA's network as well. (Compl. ¶ 37).

5. FindWhat common stock was traded on the Nasdaq Stock Market, under the ticker symbol "FWHT." (MIVA 10–K, filed March 16, 2005, at 38). The ticker symbol changed to "MIVA" in June 2005, in conjunction with the company name change. (MIVA 8–K, filed June 16, 2005, at 2).

6. Federal Rule of Civil Procedure 23 allows a plaintiff to bring litigation on behalf of a class of persons where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Subsection (b)(3) authorizes the court to certify a class if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b).

7. Defendant Agius has since been dismissed from the lawsuit in all respects. *See In re Miva, Inc., Sec. Litig.,* 544 F.Supp.2d 1310, 1318 (M.D.Fla.2008).

8. Securities Exchange Act of 1934, § 10(b), 48 Stat. 891 (1934) (codified as amended at 15 U.S.C. § 78j(b)).

9. The Plaintiffs also raised control-persons claims under § 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a). Section 20(a) provides for joint and several liability for "control persons" once a plaintiff has demonstrated a § 10(b) violation. *See id.* However, no § 20(a) claim can lie without first establishing a successful § 10(b) claim. *See Thompson v. RelationServe Media, Inc.,* 610 F.3d 628, 635–36 (11th Cir.2010) ("[A] primary violation of the securities law is an essential element of a § 20(a) derivative claim.... As the ... Complaint failed to allege primary liability under § 10(b), there can be no secondary liability under § 20(a)."). Because the district court disposed of the Plaintiffs' claims entirely on § 10(b) grounds, we only address the Plaintiffs' § 10(b) claims.

10. Although the Plaintiffs state generally that "[t]he District Court erroneously dismissed all but two of the statements in the Complaint," and that "it is clear that the statements made prior to 2005 were similarly false and misleading," (Appellant Br. at 16), the Plaintiffs offer no arguments on the merits

regarding *any* of the dismissed statements except for the two we consider here. Therefore, the Plaintiffs have abandoned any arguments regarding the other seven dismissed statements. *See Instituto De Prevision Militar v. Merrill Lynch,* 546 F.3d 1340, 1353 (11th Cir.2008) (holding that arguments not made to appellate court are abandoned); *Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir.2004) (holding that "a legal claim or argument that has not been briefed before th[is C]ourt is deemed abandoned and its merits will not be addressed").

11. Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC pursuant to § 10(b), provides in relevant part:

It shall be unlawful for any person, directly or indirectly, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5(b).

12. Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.).

13. Apparently Defendant Thune was both the Chief Operating Officer (COO) and Chief Financial Officer (CFO) at the time. ( *See* MIVA 10–K, filed Mar. 5, 2004, Exs. 31.2, 32.2).

FN14. *See* Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 302, 116 Stat. 745, 777 (codified at 15 U.S.C. § 7241) (requiring that "the principal executive officer or officers and the principal financial officer or officers ... certify in each annual or quarterly report," *inter alia,* that "the signing officer has reviewed the report," that "based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the [company]"); *id.* § 906, 116 Stat. 745, 806 (codified at 18 U.S.C. § 1350)

(requiring the chief executive officer and chief financial officer to "certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act [o]f 1934 … and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the [company]").

15. We are permitted to review the Defendants' SEC filings ourselves in evaluating the sufficiency of the Plaintiffs' allegations. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir.2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."); *Maxcess, Inc. v. Lucent Techs., Inc.,* 433 F.3d 1337, 1340 n. 3 (11th Cir.2005) ("[A] document outside the four corners of the complaint may still be considered [on a motion to dismiss] if it is central to the plaintiff's claims and is undisputed in terms of authenticity."); *Hoffman–Pugh v. Ramsey,* 312 F.3d 1222, 1225 (11th Cir.2002) (holding in libel case that the entire allegedly defamatory book "was properly before the court on the motion to dismiss," even though it had not been attached to the complaint, "because [the plaintiff] referred to it in her complaint and it [was] central to her claims"). Moreover, in securities fraud actions,

a court may take judicial notice of the content of documents filed with the SEC. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); Fed.R.Evid. 201(b)(2).

16. Because this former Fifth Circuit opinion was issued before the close of business on September 30, 1981, it is binding precedent. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

17. The 10–K generally warned about increased competition in the market for Internet-based marketing services and generally cautioned that the Company's success depended on its relationships with its distribution partners and advertisers. In particular, the latter warnings stated that "any adverse changes in our relationship with key distribution partners could have a material adverse impact on our revenue and results of operations," and "[i]f we are unable to attract additional advertisers to use our services or fail to maintain relationships with our current advertisers, it could have a material adverse effect on our business, prospects, financial condition and results of operations." (MIVA 10–K, filed Mar. 5, 2004, at 14–15). Such statements clearly fail to provide meaningful cautionary language regarding the ineffectiveness of the click-fraud monitoring systems the Company purported to employ and voluntarily touted.

18. Thus, although the Plaintiffs are correct that the court's inquiry is a "holistic[ ]" one, *Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499, and that "factual allegations may be aggregated to infer scienter," *Phillips,* 374 F.3d at 1016, the district court was correct to analyze scienter separately with respect to each allegedly false statement.

19. We adopt both the Plaintiffs' factual allegations and the Plaintiffs' characterization of those facts for purposes of this analysis. *Garfield,* 466 F.3d at 1261.

20. The entities that run pornographic websites sometimes hide malignant programs, such as spyware, behind the pictures displayed on the site. When a user clicks on a picture, the user's browser or computer is infected and used to drive traffic to affiliates of pay-per-click services, such as MIVA. Thus, it is a red flag signaling click fraud when pornographic websites generate a high volume of click traffic for non-adult keywords. (Compl. ¶¶ 47, 49).

21. Because MIVA uses a bidding model, different keywords produce different revenue-per-click rates. When a distribution partner uses click fraud, it can "cherry pick" the highest-value keywords. (Compl. ¶ 59). Therefore, excessively high revenue-per-click rates are an

immediate red flag signaling click fraud to anyone monitoring the traffic. ( *Id.*)

22. The Plaintiffs do not individually name the officers who participated in the July 26, 2004 conference call except for Defendant Thune. *See In re Miva,* 511 F.Supp.2d at 1254; ( *see also* Compl. ¶ 78).

23. The Plaintiffs appear to have abandoned the argument they made to the district court that the Defendants were obliged to disclose the bid deflation trend pursuant to the SEC Staff Accounting Bulletin ("SAB") 101. The district court rejected this argument, observing that, "[w]hile disclosure of the bid deflation trend may have been required in filings with the SEC under SAB 101 ..., there is no mandatory obligation to disclose such a trend in a conference call." *In re Miva,* 511 F.Supp.2d at 1255. The Plaintiffs have not raised this argument again in their briefs to this Court, and we do not consider it. *See Instituto De Prevision Militar,* 546 F.3d at 1353 (holding that arguments not made to appellate court are abandoned).

FN24. *See, e.g., Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) ("[T]he fundamental purpose of the 1934 Act [was] 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor.' " (quoting *Affiliated Ute Citizens v.*

*United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)) (alteration omitted)).

25. Of course, if the Defendants' statements on February 23, 2005 (or on March 16, 2005) triggered no such disclosure obligation (an issue not raised in the summary judgment motion and not properly before us)— for example, because disclosure of MIVA's click fraud problems was not necessary to prevent the statements made on that day from being materially misleading—then, naturally, any loss resulting from the Defendants' omission on that date will not be cognizable. Omissions, absent a duty to disclose, are not actionable. *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Thompson,* 610 F.3d at 681 ("Under the plain language of Rule 10b–5, for the omission of a material fact to be actionable, there must have been a duty to disclose the fact."); *Ziemba,* 256 F.3d at 1206 ("[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." (alteration in original) (internal quotation marks omitted)); *see also Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. ––––, 131 S.Ct. 1309, 1322, 179 L.Ed.2d 398 (2011) ("[C]ompanies can control what they have to disclose ... by controlling what they say to the market.").

26. The Supreme Court explained the reasoning this way in *Basic:*

The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b–5's reliance requirement must encompass these differences.

In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Basic,* 485 U.S. at 243–44, 108 S.Ct. 978 (footnotes and internal quotation marks omitted).

27. The fraud-on-the-market presumption can be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price ... paid ... by the plaintiff, or his decision to trade at a fair market price." *Basic,* 485 U.S. at 248–49, 108 S.Ct. 978. For example, the

defendant can rebut the presumption of reliance by presenting evidence that the market price did not in fact reflect the misrepresentation, or that the particular plaintiff knew about the fraud but bought the stock at that price anyway for independent reasons. *Id.* The reliance element of a Rule 10b–5 action, therefore, patrols the question of whether the defendant's fraud in fact affected (or inflated) the purchase price that investors paid. *See id.* at 247–48, 108 S.Ct. 978; *Lipton v. Documation, Inc.,* 734 F.2d 740, 745 (11th Cir.1984); *Peil,* 806 F.2d at 1161.

FN28. *See In re REMEC Inc. Sec. Litig.,* 702 F.Supp.2d 1202, 1266–67 (S.D.Cal.2010) ("A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market." (internal quotation marks omitted)). A corrective disclosure can come from any source, and can "take any form from which the market can absorb [the information] and react," Matthew L. Fry, Pleading and Proving Loss Causation in Fraud–on–the–Market–Based Securities Suits Post–Dura Pharmaceuticals, 36 Sec. Reg. L.J. 31, 64–71 (2008), so long as it "reveal[s] to the market the falsity" of the prior misstatements, *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 n. 4 (2d Cir.2005). In order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a " *corrective* effect," rather than merely a " *negative* effect." *In re Initial*

*Public Offering Sec. Litig.,* 399 F.Supp.2d 261, 266 (S.D.N.Y.2005); *see also In re Williams Sec. Litig.— WCG Subclass,* 558 F.3d 1130, 1140 (10th Cir.2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but [its subject matter] must at least relate back to the misrepresentation and not to some other negative information about the company."); *Lentell,* 396 F.3d at 173 ("[T]o establish loss causation, a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered...." (internal quotation marks and alteration omitted)). Moreover, because a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory. *See Catogas v. Cyberonics, Inc.,* 292 Fed.Appx. 311, 314 (5th Cir.2008).

FN29. *See also Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* 597 F.3d 330, 336–37 (5th Cir.2010) ("Causation therefore requires the Plaintiff to demonstrate the joinder between an earlier false or deceptive statement, for which the defendant was responsible, and a subsequent corrective disclosure that reveals the truth of the matter, and that the subsequent loss could not otherwise be explained by some additional factors revealed then to the market."); *Glaser v. Enzo Biochem, Inc.,* 464 F.3d 474, 477 (4th Cir.2006) (" *Dura* requires plaintiffs to plead loss causation by alleging

that the stock price fell after the truth of a misrepresentation about the stocks was revealed...."); *In re REMEC Inc.,* 702 F.Supp.2d at 1266 ("Price inflation alone is insufficient [to establish loss causation]; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market."); *In re Intelligroup Sec. Litig.,* 527 F.Supp.2d 262, 295 (D.N.J.2007) ("[T]he holding of *Dura* makes it clear that, in order to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." (internal quotation marks and alterations omitted)).

30. Although the Defendants moved in a separate motion to exclude Dr. Hakala's report on the ground that his reasoning and methodology failed to comply with Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the district court denied the Defendants' *Daubert* motion as moot upon granting summary judgment in the Defendants' favor. *See In re MIVA,* 2009 WL 3821146, at *5. Notably, the district court never purported to reject Dr. Hakala's report by finding that Hakala was not qualified by background and training to opine

about loss causation or damages, or that his methodology was not sufficiently reliable, or that his testimony would not be helpful to the trier of fact. *See United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (en banc) (describing three-part inquiry a district court must conduct to admit expert testimony under Rule 702). Indeed, the district court did not even hold a hearing regarding Hakala's expert qualifications. If the Defendants choose to renew their *Daubert* motion in light of this remand order, the district court must conduct the requisite Rule 702 inquiry before it may disregard the evidence offered by Dr. Hakala.

31. Event studies can be used to determine retrospectively the cause of a stock price movement. The analyst first estimates a "predicted return," based on the firm's average return during a control period as well as on market and industry factors. If the actual stock price moves differently than the predicted return, the analyst then determines whether such "abnormal returns" are the result of chance or are instead statistically attributable to the information release. *See In re Williams Sec. Litig.,* 496 F.Supp.2d 1195, 1272 (N.D.Okla.2007); Allen Ferrell & Atanu Saha, The Loss Causation Requirement for Rule 10b–5 Causes of Action: The Implications of *Dura Pharmaceuticals, Inc. v. Broudo*, 63 Bus. Law. 163, 167 (2007). The methodology of event studies has

been sustained by many circuits. *See, e.g., Archdiocese of Milwaukee,* 597 F.3d at 341 (noting that event studies "demonstrate[ ] a linkage between the *culpable* disclosure and the stock-price movement"); *Schiff,* 602 F.3d at 173–74 & nn. 29–31 (accepting as reliable under *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, an event study that linked a stock price drop with the revelation of fraud, for purposes of establishing materiality); *Schleicher,* 618 F.3d at 684 (affirming class certification based on expert's event study).

32. The analysis also appears to conflate the concepts of reliance and loss causation—two distinct elements of a Rule 10b–5 claim. As noted above, reliance polices the front-end causation question of whether the defendant's fraud in fact inflated the plaintiff's purchase price, while loss causation polices the back-end causation question of whether the fraud-induced inflation in the plaintiff's purchase price ultimately caused financial losses. To the extent the district court concluded that the Defendants' fraud did not affect the purchase price the Plaintiffs paid—because the inflation in the price predated the fraudulent statements—this appears to be a conclusion drawn about reliance, not loss causation. Indeed, the Court in *Basic* presaged the Defendants' argument here and expressly placed it under the rubric of reliance, saying that fraud-on-the-market defendants may rebut the presumption of reliance by showing that "the misrepresentation in fact

did not lead to a distortion of price." 485 U.S. at 248, 108 S.Ct. 978. This appears to be essentially what the Defendants argued and the district court accepted, albeit using the language of loss causation. On remand, the parties should clarify their causation arguments, and specify whether their dispute actually goes to reliance or loss causation.

33. The Fifth Circuit appears to have rejected this view, holding that confirmatory information cannot be actionable. *See Greenberg,* 364 F.3d at 665 (stating that "confirmatory information cannot be the basis for a fraud-on-the-market claim"); *see also Archdiocese of Milwaukee,* 597 F.3d at 337 (explaining *Greenberg* as holding that confirmatory statements are not actionable because "[c]onfirmatory information is already known to the market and, having been previously digested by the market, will not affect the stock price"), *cert. granted sub nom. Erica P. John Fund, Inc. v. Halliburton Co.,* ––– U.S. ––––, 131 S.Ct. 856, 178 L.Ed.2d 622 (2011) (addressing different issue). No other circuit has embraced this view. The rule also appears to conflict with the Fifth Circuit's own recognition in *Nathenson v. Zonagen Inc.,* 267 F.3d 400 (5th Cir.2001), that fraudulent information that confirms what the market already believes is actionable if it prevents the stock price from dropping to the level the market would set if the truth were revealed. In *Nathenson,* the court said:

We also realize that in certain special circumstances public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change. For example, if the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall).

*Id.* at 419; *see also Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 403 n. 14 (5th Cir.2007) (Dennis, J., concurring in the judgment) ("[T]here appears to be no basis in *Nathenson* or otherwise for *Greenberg* 's conclusion that false 'confirmatory' statements can never support a claim proceeding under a fraud-on-the-market theory.").

While we agree with the Fifth Circuit that confirmatory information will not likely move the market price at the time of its release—because the market already digested the information when it was first released—we do not agree that such confirmatory information can therefore never be actionable. If a company knowingly makes materially false representations with the purpose and effect of preventing the stock price from falling to the level that the truth would yield, the company is responsible for perpetuating inflation within the stock price. *See Schleicher,* 618 F.3d at 683–84 (holding that companies are liable for "stop[ping] a price from declining" because, "the fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied"); *In re Cooper Sec. Litig.,* 691 F.Supp.2d 1105, 1116 (C.D.Cal.2010) (holding that a company can be liable for "caus[ing] artificial inflation to continue to be incorporated into the stock price, as opposed to revealing the truth, which allegedly would have caused the stock price to fall").

FN34. *Cf. Matrixx Initiatives,* 131 S.Ct. at 1313–16 (holding that plaintiffs had adequately pled a Rule 10b–5 claim—where defendant had disputed the sufficiency of the allegations with respect to the elements of scienter and materiality—by alleging that defendant had forestalled a stock price drop by making affirmative statements confirming the market's impression that defendant's leading product was safe, despite defendant's awareness of evidence suggesting a significant risk that the nasal spray led to loss of sense of smell; when the risk was finally (belatedly) disclosed, the stock price plummeted).

35. When a defendant issues an intentionally false statement, "the purpose and effect is to cause the

market to attribute artificial inflated value to the stock. That market reaction is by definition a foreseeable consequence of fraud." Madge S.

Thorsen, Richard A. Kaplan & Scott Hakala, Rediscovering the Economics of Loss Causation, 6 J. Bus. & Sec. L. 93, 99 (2006).

# EXHIBIT C

## History by date

**Since**

mm/dd/yyyy

**Until**

mm/dd/yyyy

Search

## November 30th 2025

| | | |
|---|---|---|
| 📄 Horizon Aggressive Growth, L.P. v. Rothstein-Kass | | 15:40 |
| 🔍 search   jurisdiction Out of state defamation   in   United States   11th Circuit   1,464 results | | 15:40 |
| 📄 Malletier v. Mosseri | | 14:51 |
| 🔍 search   "accept as true"   in   United States   11th Circuit   17,442 results | | 14:49 |
| 🔍 search   "calder" "jones"   in   United States   11th Circuit   280 results | | 13:50 |
| 🔍 search   "motion to dismiss" "defamation"   in   United States   11th Circuit   1,692 results | | 13:47 |
| 🔍 search   "motion to dismiss"   in   United States   11th Circuit   55,525 results | | 13:47 |

**5**   Get Started

search    "rule 12 b 6" "standard"    in    United States    United States Supreme Court, 11th    13:46
Circuit    13,217 results

Mazzeo v. Color Resolutions Int'l, LLC    13:44

search    "motion to dismiss" "Rule 12 b 6"    in    United States    United States Supreme    13:41
Court, 11th Circuit    13,755 results

search    "motion to dismiss" "Rule 129b 6"    in    United States    United States Supreme    13:41
Court, 11th Circuit    1 results

Mazzeo v. Color Resolutions Int'l, LLC    12:48

search    "interactive process does not end"    in    United States    United States Supreme    11:21
Court, 11th Circuit    1 results

search    "breen" "dep/'t"    in    United States    United States Supreme Court, 11th Circuit    11:21
24 results

November 30th 2025

search   "breen" "282 f.3d"   in   United States      United States Supreme Court, 11th Circuit     11:20
3 results

search   "breen"   in   United States      United States Supreme Court, 11th Circuit      154     11:20
results

## November 29th 2025

Thomas v. Cooper Lighting, Inc.     17:29

search   "continuous pattern of antagonism"   in   United States      United States Supreme     17:29
Court, 11th Circuit     7 results

search   continuous pattern of antagonism   in   United States      United States Supreme     17:29
Court, 11th Circuit     26 results

Wideman v. Wal-Mart Stores, Inc.     17:25

Combs v. Plantation Patterns     17:22

search   "combs" Plantation pattern   in   United States      United States Supreme Court, 11th     17:21
Circuit     1,421 results

📄   Anderson v. Creighton      17:12

📄   Narro v. Edwards      17:12

▸ 🔍   search   "factual disputes" "performance" "jury"   in   United States    United States Supreme Court, 11th Circuit    1,007 results      17:12

▸ 🔍   search   "factual diputes" "performance" "jury"   in   United States    United States Supreme Court, 11th Circuit    0 results      17:12

📄   Howard v. Walgreen Co      17:09

## November 28th 2025

📄   Jones v. Gulf Coast Health Care of Del., LLC      17:04

📄   Burrell v. Board of Trustees of Georgia Military College      17:04

▸ 🔍   search   "temporal proximity" "retaliation" "FMLA"   in   United States    United States Supreme Court, 11th Circuit    508 results      15:01

▸ 🔍   search   "temporal proximity" "retalihation" "FMLA"   in   United States    United States Supreme Court, 11th Circuit    0 results      15:01

## November 28th 2025

📄 Bradford v. Regions Fin. Corp., CIVIL ACTION NO. 2:13-CV-00642-KOB          13:08

▶ 🔍 search   "Reasonable accommodations" "Regions"   in   United States    United States          13:08
Supreme Court, 11th Circuit     18 results

▶ 🔍 search   Reasonable accommodations Regions   in   United States    United States Supreme          13:07
Court, 11th Circuit     59 results

▶ 🔍 search   ADA Reasonable accommodations Regions   in   United States    United States          13:06
Supreme Court, 11th Circuit     23 results

📄 Bradford v. Regions Fin. Corp., CIVIL ACTION NO. 2:13-CV-00642-KOB          12:05

▶ 🔍 search   ADA Reasonable accommodations Regions   in   United States    United States          12:05
Supreme Court, 11th Circuit     23 results

📄 Mazzeo v. Color Resolutions Int'l, LLC          12:03

## November 26th 2025

Patterson v. Ga. Pac., LLC     18:34

search   "Summary judgment" "all inferences"   in   United States    United States Supreme   18:28
Court, Federal Courts of Appeals, Federal District Courts, 11th Circuit    38,817 results

## November 21st 2025

search   "national trust insurance company"   in   United States    Alabama    3 results    11:48

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Eagle Equipment Trust    11:40

search   "national trust"   in   United States    Alabama    62 results    11:40

search   "hoge" "national trust"   in   United States    Alabama    0 results    11:40

search   "hoge" "southern heating"   in   United States    Alabama    0 results    11:40

search   hoge "southern heating"   in   United States    Alabama    0 results    11:40