FILED

2026 May-21  PM 12:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JACKIE L. MILLER,

     **Plaintiff**,

v.

REGIONS BANK,

     **Defendant**.

Case No. 2:24-cv-1324-HDM

## ORDER

This case is before the court for ongoing disciplinary proceedings against Attorney H. Gregory Harp, a solo practitioner, following Attorney Harp's misuse of generative artificial intelligence to make false statements to the court. The court previously issued two orders to show cause: one for Attorney Harp to show good cause why he should not be sanctioned for making false statements to the court, (doc. 29 at 2–3), and the other for Attorney Harp to show good cause why he should not be held in civil contempt for disobeying a court order and sanctioned for bad faith obstruction of the judicial process and spoliation of evidence, (doc. 35 at 4–5).

The court is deeply troubled by Attorney Harp's apparent contempt and utter lack of respect for the court and the judicial process that it represents. He has obfuscated the truth at every turn. He has pleaded ignorance as to any wrongdoing, then turned around and destroyed the evidence that likely would have exposed him.

He has consumed substantial judicial resources as the court has had to sift through an ever-evolving series of distortions, evasions, and half-explanations designed to obscure rather than illuminate the truth. The court never imagined that it would be faced with such atrocious conduct from an officer of the court, and it will not tolerate it.

The court is not sanctioning Attorney Harp merely for using generative AI. Attorneys may use such tools responsibly. The sanctionable conduct here includes Attorney Harp's submission of false legal authority, lack of reasonable inquiry, lack of candor to the court, and destruction of evidence during the ensuing sanctions investigation.

For the reasons more thoroughly explained below, the court **SANCTIONS** Attorney Harp.

## BACKGROUND

On November 30, 2025, Plaintiff Jackie Miller, through her attorney, H. Gregory Harp, filed a Response in Opposition, (doc. 23), to Defendant Regions Bank's Motion for Summary Judgment, (doc. 19).

In his Response, Mr. Harp includes four false quotations. (*See* Doc. 23 at 22, 24, 25, 32). These quotations—along with the cases to which they are attributed and any language necessary for context—are as follows:

> *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256–57 (11th Cir. 2007) (questions regarding the extent of limitations and need for accommodation are "classic jury issues").

*Id.* at 22;

> *See EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1345 (11th Cir. 2016) ("The ADA does not mandate a particular interactive process, but it does require the employer to provide a reasonable accommodation when one is needed.").

*Id.* at 24;

> *See, e.g.*, *Breen v. Dep't of Transp.*, 282 F.3d 839, 842 (D.C. Cir. 2002) ("The interactive process does not end with generic, non-responsive offers untethered to the employee's disability-related limitations.").

*Id.* at 25;

> The Eleventh Circuit broadly interprets adverse action in the FMLA retaliation context to include "any action that might dissuade a reasonable worker from exercising FMLA rights." *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018).

*Id.* at 32. The court conducted a thorough search for each of these quotations.

Although the cases are real, the court was unable to find the quotations within them

or in any other authority the court reviewed.

> Based on these events, the court issued a show cause order, in which it stated:

> The presence of these four quotations leads the court to believe that Mr. Harp, possibly using generative artificial intelligence, fabricated quotations from legal authority. Accordingly, Mr. Harp is **ORDERED** to review all of his filings in this case, and if any other misrepresentations of law—be they nonexistent quotations, nonexistent cases, or any other misrepresentation of law—are brought to Mr. Harp's attention by his own review or otherwise, they shall be subject to this Order.

3

Mr. Harp, as the only attorney to have appeared on behalf of Ms. Miller and the only signatory on the response brief primarily in question, is **ORDERED** to show good cause, if there be any, why he should not be sanctioned—based on the quotations identified in this order and any additional misrepresentations of law discovered in Mr. Harp's filings in this case—under Federal Rule of Civil Procedure 11, the court's inherent authority, Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the court, not later than **3:00 PM Central Daylight Time on Thursday, April 16, 2026**. Mr. Harp is **ORDERED** to append to his filings copies of each legal authority from which an allegedly fabricated passage was quoted, with the quotation highlighted. If any other misrepresentations of law exist in any other of his filings in this case, Mr. Harp is **ORDERED** to similarly append copies of the cited authority with relevant portions highlighted. If Mr. Harp cannot provide such copies for each alleged misrepresentation, he is further **ORDERED** to submit a sworn declaration that provides a thorough explanation for how any disputed filing, including the response brief, (doc. 23), was generated. Specifically, the declaration must explain precisely how the allegedly fabricated quotations (or other alleged misrepresentations) were generated. Finally, Mr. Harp is **ORDERED** to append to his filings a sworn certification that he has thoroughly reviewed all of his filings in this case and, if no other misrepresentations of law are found, that each representation of law is true and accurate.

(Doc. 29 at 2–3). In that Order, the court also set a show cause hearing on the issue.

*Id.*

In his Response to the court's Order, Attorney Harp stated that he does not know how the false quotations ended up in his submitted brief, but that he did not use AI to generate them. (Doc. 30). At the subsequent hearing, which took place on April 20, 2026, Attorney Harp stated that while he used "ChatGPT to do a general search," neither ChatGPT nor any other AI "wrote a single word" of his brief. Transcript of Show Cause Hearing, at 12–13 (April 20, 2026) [hereinafter, "Hearing

4

Transcript"]. When pressed on whether the false quotations were originally generated by ChatGPT, Attorney Harp stated, "Not to my knowledge." *Id.* at 7. Attorney Harp admitted, however, that he did not go back and check his ChatGPT search history. *Id.* at 10. He later clarified that he was "happy to go back and try to pull a log" of his ChatGPT history after the hearing. *Id.* at 47.

Accordingly, on April 20, right after the hearing concluded, the court ordered Attorney Harp to submit to the court for in camera inspection "[s]creenshots of [his] ChatGPT history showing the entirety of all conversations related to this case." (Doc. 31). On April 29, Attorney Harp submitted a flash drive in response to the court's order. That flash drive contained, among other things not relevant here, a one-page, unsigned PDF entitled "Your Honor" which states, in its entirety:

> I have attempted to comply with the Court's Order requiring me to furnish ChatGPT screenshots and native files; however, **my account has been deleted**, and the files are no longer available. I have attempted, in good faith, to recover the account, but I was unable to do so. From my review, it appears that it is not able to be recovered.

(Doc. 37 (emphasis added)).

On suspicion that Attorney Harp intentionally deleted his ChatGPT account in order to destroy evidence of AI misuse, the court, on April 29, ordered Attorney Harp to submit a sworn declaration explaining "the specific steps he undertook to comply with the court's April 20, 2026, Order" and "in granular detail exactly how, when, why, and by whom his ChatGPT account was deleted." (Doc. 33 at 3). The

court also ordered Attorney Harp to "[s]ubmit screenshots of every email, text message, or other communication Attorney Harp has received, on any email address, from or relating to OpenAI or ChatGPT." *Id.* Specifically, the court made clear that it wanted screenshots of emails confirming Attorney Harp's ChatGPT account creation and deletion. *Id.* at 3–4. At a minimum, once the court ordered Attorney Harp to produce his ChatGPT history, he had a clear and specific duty to preserve that evidence. *See In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. 180, 185 (N.D. Fla. 2021) ("The obligation to preserve evidence arises when a party has notice the evidence is relevant to litigation or when a party should have known the evidence may be relevant to future litigation.").

Attorney Harp submitted his response on May 1. In it, he states that he deleted his ChatGPT account, though he does not know the exact date and time of such action. (Doc. 34 at 2). However, he states that "**[a]fter the hearing** I was extremely upset that I had used ChatGPT at all. I went to ChatGPT.com and initiated actions to completely deactivate the account." *Id.* (emphasis added).

Attorney Harp's submitted email screenshots show that he signed up for a paid ChatGPT Plus subscription on November 26, 2025. (Doc. 38 at 20). This is contrary to Attorney Harp's statement at the April 20 show cause hearing that he used the free version of ChatGPT. Hearing Transcript at 21. Indeed, because Attorney Harp's brief was submitted on November 30, 2025—only four days after he purchased

6

ChatGPT Plus—the implication is that he purchased ChatGPT Plus specifically to use it in this case. (*See* Doc. 23). Attorney Harp's emails also show that his ChatGPT account was deleted on April 23, 2026. (Doc. 38 at 4–5). An email from OpenAI on April 23 at 6:21 AM states, "Your ChatGPT Plus subscription will not renew and will be canceled, but is still available until the end of your billing period on April 30, 2026. If you change your mind, you can renew your subscription." *Id.* An email attachment—that appears to be from a separate email from OpenAI on April 23 at 6:25 AM—states that Attorney Harp "requested" a prorated refund for the remaining part of the billing period, which OpenAI initiated in the amount of five dollars and twenty-seven cents. (Doc. 38 at 1, 41–46).

These emails indicated to the court that Attorney Harp canceled his ChatGPT account on April 23, **three days *after*** he was ordered to turn information from that account over to the court. Even so, he would have maintained access to his account until April 30—one day beyond the court's April 29 deadline for turning over his ChatGPT history—but he requested and received a prorated refund for the remaining portion of the billing period rather than maintaining access through April 30.

Based on these events, the court issued a second show cause order, in which it stated:

> This sequence of events demonstrates that Attorney Harp, after being ordered to produce his ChatGPT history, affirmatively took multiple steps to delete his account before the production deadline. This conduct supports a strong inference that Attorney Harp acted in bad faith to

prevent the court from obtaining evidence directly bearing on the issues raised in the show cause proceedings, evidence that the court had specifically and unequivocally ordered Attorney Harp to produce. This also casts significant doubt—to put it mildly—on Attorney Harp's April 29 written statement that he "attempted, in good faith, to recover the account" that he had, we now know, taken pains to delete just a few days before.

Accordingly, Attorney Harp is **ORDERED** to show good cause, if there be any, on or before **May 11, 2026**, at **3:00 PM CST**, why he should not be held in civil contempt for willfully disobeying the court's April 20, 2026, Order; sanctioned under the court's inherent authority for bad faith obstruction of the judicial process and spoliation of evidence—including, but not limited to, the imposition of an adverse inference of AI usage; or otherwise sanctioned under the court's inherent authority for violations of Alabama Rule of Professional Conduct 3.4(a) (destruction of material having potential evidentiary value), 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), and 8.4 (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation and conduct that is prejudicial to the administration of justice).

(Doc. 35 at 4–5).

In his Response to the Second Show Cause Order, Attorney Harp stated,

I have reviewed the Court's show cause order (Doc. 35) and can offer no grounds for the avoidance of sanctions and a finding of civil contempt other than the information I have previously provided. The Court is correct that I filed a submitted Document 23 which contained misstatements of law that included misrepresented quotes to legal authorities. The Court is correct that I deleted ChatGPT. . . . I remain contrite . . . ."

(Doc. 36 at 1–2).

## DISCUSSION

Discipline is appropriate both for Attorney Harp's false statements of law and his obstruction of the judicial process. The court separates these sanctions in order

8

to distinguish the consequences of making unintentional false statements—generated by AI or otherwise—to the court from the much more serious sanctions imposed for obfuscating the truth, refusing to own up to one's mistakes, and destroying evidence to cover one's tracks. As the court warned Attorney Harp in its April 29 Order, "any attempt to conceal evidence from the court will result in further investigation and rapidly escalating sanctions." (Doc. 33 at 4).

## I.      False Statements of Law

Citations to fake legal authority pose a serious threat to the fair administration of justice and the integrity of the judicial system, and they require an equally serious sanction. *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1246 (N.D. Ala. 2025). This court has stated,

> **Even in cases . . . where lawyers who cite AI hallucinations accept responsibility and apologize profusely, much damage is done**. . . . [T]he court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished.

*State Nat'l Ins. Co., Inc. v. Treadwell*, No. 2:24-cv-1424-HDM, 2026 WL 861076, at *2 (N.D. Ala. Mar. 27, 2026) (quoting *Johnson*, 792 F. Supp. 3d at 1246). Other harms affect the judicial system more broadly:

> There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system.

9

And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity.

*Johnson*, 792 F. Supp. 3d at 1257 (quoting *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023)).

As this court has previously stated,

If any lawyer is under the misapprehension that, as long as he brings the correct issues to the court's attention, the court will come to the correct conclusion on its own and therefore he need not worry about the granular accuracy of his citations, that lawyer must shift his mindset. The importance of this topic is not solely rooted in some high-minded ideal of the legal profession as an honorable one. In order to fairly, efficiently, and, above all, *accurately* adjudicate cases, federal courts *must* be able to rely on the specific authorities cited by parties, not simply the broad principles of law they state. The federal judiciary has neither the resources nor the obligation to do a lawyer's job for him, especially given his clients are already paying him to do that job. Every second the court spends doing a lawyer's job for him—as this court was compelled to do for [Attorney Harp]—is a disservice to his clients and a waste of taxpayer dollars that needlessly defers other necessary work.

*Treadwell*, 2026 WL 861076, at *2.

Accordingly, the court makes the following conclusions of law and findings of fact based on Attorney Harp's conduct.

### A. Sanctions Authority

Rule 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper[,] . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances* . . . the claims, defenses, and other legal contentions are warranted by

10

existing law." Fed. R. Civ. P. 11(b)(2) (emphasis added). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated" and "may include nonmonetary directives." Fed. R. Civ. P. 11(c)(4).

Rule 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). Rule 11 focuses on "the signer's conduct" "at the time of filing." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (emphasis and internal quotation marks omitted). "[T]he purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989).

To impose Rule 11 sanctions *sua sponte*, the court must find that offending conduct is "akin to contempt." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). But, as this court has stated,

> This court does not understand that standard to require a finding of subjective bad faith. Such a requirement would be inconsistent with explanations from the Supreme Court and the Eleventh Circuit that Rule 11 is objective, *see, e.g.*, *Chambers*, 501 U.S. at 47; *Jones*, 49 F.3d at 695, and the reality that "[a]s originally drafted, Rule 11 set out a subjective standard, but the Advisory Committee determined that this

11

standard was not working," *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 549 (1991).

*Johnson*, 792 F. Supp. 3d at 1258.

Local Rule 83.1(f) provides that attorneys may be disciplined for acts or omissions that are inconsistent with the local rules, the *Alabama Rules of Professional Conduct*, and the *American Bar Association Model Rules of Professional Conduct.* N.D. Ala. R. 83.1(f). It further provides that "[d]iscipline under this Rule may consist of disbarment, suspension, censure, reprimand, removal from a particular case, ineligibility for appointment as court-appointed counsel, ineligibility to appear [*pro hac vice* or on behalf of the United States], monetary sanctions, or any other sanction the court may deem appropriate." *Id.*

Alabama Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal." Ala. Rules of Pro. Conduct r. 3.3(a)(1). The comments to the Rule provide that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Ala. Rules of Pro. Conduct r. 3.3. cmt. They further provide that "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal." *Id.*

12

The court's sanctioning authority is not limited to these rules, as it may also sanction attorneys under its inherent authority. *Chambers*, 501 U.S. at 43 (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)); *Johnson*, 792 F. Supp. 3d at 1258. *See also* Section II(C), *infra*.

### B. False Statements of Law and Conclusions as to Attorney Harp

The court finds, based upon its own careful review and Attorney Harp's eventual admission, (doc. 36 at 1–2), that the purported quotations in the filing at issue were made up and thus to attribute those quotes to the quoted authority was to make false statements of law.

Attorney Harp has never admitted that he used generative AI to draft the filing or create the specific quotations at issue.[1] However, the Eleventh Circuit has established that "an adverse inference is drawn from a party's failure to preserve evidence . . . when the absence of that evidence is predicated on bad faith." *Hill v. Cundiff*, 797 F.3d 948, 967 n.10 (11th Cir. 2015). As is discussed below, the court finds that Attorney Harp in bad faith deleted his ChatGPT account after being ordered to produce it to the court. *See* Section II(A)(ii), *infra*. Accordingly, the court

---

[1] Where the court speculates that generative AI was used but has no proof of such usage, the court need not make a finding of AI usage to sanction an attorney for making misrepresentations to the court. *See Wilson v. City of Athens*, 5:24-cv-1757-LCB (N.D. Ala. Feb. 3, 2026). Accordingly, the court's imposed sanctions stand regardless of any AI usage. *See id.* Nonetheless, because the court can, in this case, make an adverse inference of AI usage against Attorney Harp, it will do so. Unchecked generative AI usage has become a scourge on the courts, and it must be called out and reined in at every opportunity.

13

draws an adverse inference against Attorney Harp and concludes that his ChatGPT account, had he not deleted it, would have shown that the four quotations at issue— and likely other statements of law that the court drew to Attorney Harp's attention as incorrect,[2] *see, e.g.*, Hearing Transcript at 12–13—were generated by ChatGPT. Accordingly, despite Attorney Harp's continued refusal to admit as much, the court infers that the missing ChatGPT history would have shown that ChatGPT generated the fabricated quotations and related legal misrepresentations contained in the Response Brief. The court finds that Attorney Harp submitted those misrepresentations to the court, "certif[ying] that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . [those] legal contentions are warranted by existing law." *See* Fed. R. Civ. P. 11(b).

The court finds that Attorney Harp's conduct is "akin to contempt," *Kaplan*, 331 F.3d at 1255, as it flagrantly disregards his obligations as an attorney under Rule 11. As the court understands Attorney Harp's position, although he does not admit that generative AI drafted sections of his Response Brief, he does not contest that he made misrepresentations to the court. (Doc. 36 at 1 ("The Court is correct that I filed

---

[2] *See* Footnote 3, *infra* (explaining the court's choice not to pursue sanctions for these other misrepresentations).

a submitted Document 23 which contained misstatements of law that included misrepresented quotes to legal authorities.")).

### C. Sanctions

Rule 11 states that if an attorney presents to the court "legal contentions" that "are [not] warranted by existing law," that attorney may be sanctioned after notice and a reasonable opportunity to respond. Fed. R. Civ. P. 11(b)(2), (c)(1). Attorney Harp presented to the court four purported quotations as legal contentions,[3] and none are warranted by existing law. Attorney Harp has been given notice and a reasonable opportunity to respond. (*See* Docs. 30, 34, 36). *See also* Hearing Transcript.

Accordingly, the court must now determine an appropriate sanction under Rule 11.[4] This court has stated that "[a]n appropriate and reasonable sanction must . . . correspond to the extreme dereliction of professional responsibility that sham citations reflect (whether generated by artificial or human intelligence), and . . . effectively communicate that made-up authorities have no place in a court of law." *Johnson*, 792 F. Supp. 3d at 1246. "Rule 11 assigns particular value to the deterrent

---

[3] Although Attorney Harp's Response Brief is rife with other errors, the court chooses to focus solely on his false quotations for purposes of administering sanctions, as a finding that his other misrepresentations of law constitute violations of Rule 11 would not alter the court's sanctions analysis. No attorney should take this as an indication, however, that the court will not vigorously investigate each and every misrepresentation of law that any attorney files, regardless of format.

[4] Because Rule 11 provides adequate sanctions in this case, the court, in its discretion, chooses not to pursue sanctions for these misrepresentations of law under other statutes or its inherent authority.

function of a sanction." *Id.* at 1265 (citing Fed. R. Civ. P. 11(c)(4) (providing that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated")).

Here, the court finds a public reprimand with a limited publication requirement to be fitting. Some meaningful sanction for these misrepresentations is absolutely necessary, but the court reserves imposition of harsher sanctions for Attorney Harp's dishonesty in attempting to cover up his AI usage. *Compare* Section II(C)(iii), *infra* (disqualifying Attorney Harp from this case, suspending him from practicing in the Northern District of Alabama, and referring the case to the Alabama State Bar), with *Treadwell*, 2026 WL 861076, at *4 ("Mindful of the fact that Mr. May has been apologetic and forthcoming with his lack of diligence and use of generative AI, the court finds that any greater sanction is unnecessary. Specifically, the court will not, in this instance, refer this matter to the Alabama State Bar, order a monetary fine, disqualify Mr. May from this case, or suspend him from practice in the Northern District of Alabama . . . .").

## II.    Spoliation of Evidence and Civil Contempt

Although making false statements of law to the court is undoubtedly unacceptable, the more serious offense committed by Attorney Harp is spoliation of evidence and direct contravention of a court order. Attorney Harp did not admit to

16

using generative AI, and then he lied and destroyed evidence to cover up his AI usage.

In response to the court's First Show Cause Order, (doc. 29), Attorney Harp gave what he averred to be a full exposition of his process for writing the Response Brief in question, (doc. 30). In it, he states that he used vLex for legal research, *id.*, ¶ 21, wrote his brief based on that legal research, *id.*, ¶¶ 21–25, and then used the CoPilot attachment to Microsoft Word to check for grammar, punctuation, and spelling errors, *id.*, ¶ 25. At no point in his Response did Attorney Harp mention using ChatGPT for any purpose. *See id.*

At the April 20 hearing, Attorney Harp, when pressed on the issue, stated that he did use ChatGPT "to do a general search" and then "went to vLex and . . . pulled each one of those cases" that ChatGPT found. Hearing Transcript at 5. He then clarified that "ChatGPT did generate" text, but "the words that were typed in the document [were his] words." *Id.* at 6. When pressed further, he stated that "to [his] knowledge," the quotations at issue were not generated by ChatGPT. *Id.* at 7. He then hedged on that statement and stated that they "could have been generated by ChatGPT." *Id.*

He then, confusingly, stated that he "know[s] it was not ChatGPT that created [the] quotes because [he] went back and checked them," *id.* at 8, though he cannot account for how, if he checked each quote, four completely fabricated quotations

17

ended up in the Response Brief. And he simultaneously admitted that "it's possible that I did get out over my skis and allow ChatGPT to lead me in the manner in which it shouldn't have led me." *Id.* at 9.

Attorney Harp's prevarication frustrated the court. When asked whether he had checked his ChatGPT history to confirm that the quotations were not AI generated, Attorney Harp stated that he had not. *Id.* at 10. This frustrated the court further. It was at this point that Attorney Harp clarified that he was "happy to go back and try to pull a log" of his ChatGPT history after the hearing. Hearing Transcript at 47.

Because of Attorney Harp's continued obfuscation of the truth and based on his offer to produce his ChatGPT history, the court, on April 20, 2026, right after the hearing, ordered Attorney Harp to produce screenshots of his ChatGPT history, (doc. 31), to which Attorney Harp stated in vague terms that his "account has been deleted," (doc. 37). From the emails that the court ordered Attorney Harp to produce, it became clear that he had deleted his ChatGPT account on April 23—three days after being ordered to produce his ChatGPT history—and undertook further steps to ensure that he lost access immediately rather than at the end of the current pay cycle.

Accordingly, the court makes the following conclusions of law and findings of fact based on Attorney Harp's conduct.

### A. Spoliation of Evidence

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009).

### i.    Sanctions Authority

In a diversity action such as this one, federal law governs spoliation sanctions. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). However, a court may look to state law for guidance to the extent it is consistent with federal law. *Flury v. DaimlerChrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), *superseded on other grounds by Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023) (holding that in cases involving loss of electronically stored information governed by Federal Rule of Civil Procedure 37(e), Rule 37(e)'s sanctions analysis, not *Flury*'s, applies).[5]

---

[5] The court recognizes that the present case involves electronically stored information in the form of ChatGPT query history and thus may appear on its surface to be governed by Rule 37(e). However, Rule 37(e) applies only "upon finding prejudice to another party from loss of the information," Fed. R. Civ. P. 37(e)(1), or "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2). It is not clear that Rule 37(e) applies when a party intends to deprive the *court*, rather than another party, of the information's use in a sanctions inquiry. It is exactly in situations such as this one where the court's inherent authority to sanction is most useful. Regardless, if Rule 37(e) *does* apply to the present situation, the "'intent to deprive another party of the information's use in the litigation' is the equivalent of bad faith in other spoliation contexts." *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023) (quoting Fed. R. Civ. P. 37(e)(2)). Because the court makes a finding of bad faith here, Rule 37(e)(2) is satisfied, and the court may "presume that the lost information was unfavorable to [Attorney Harp]." Fed. R. Civ. P. 37(e)(2)(A). Accordingly,

"Spoliation sanctions are often imposed under the broad discretion of the district court, which has inherent power to 'manage its own affairs and to achieve the orderly and expeditious disposition of cases.'" *Skanska USA Civ. Se. Inc.*, 75 F.4th at 1311 (quoting *Flury*, 427 F.3d at 944). The court's inherent power to sanction attorneys has been recognized for more than two hundred years. *Chambers*, 501 U.S. at 43 (quoting *Hudson*, 11 U.S. at 34). "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Id.* "The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

Generally, "[a] party seeking spoliation sanctions must prove that (1) the missing evidence existed at one time; (2) the defendant had a duty to preserve the evidence; and (3) the evidence was crucial to the plaintiff's prima facie case." *Coward v. Forestar Realty, Inc.*, No. 4:15-cv-0245, 2017 WL 8948347, at *7 (N.D. Ga. Nov. 30, 2017); *see also Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1291 (S.D. Fla. 2020). "Even if all three elements are met, a party's failure to preserve evidence rises to the level of sanctionable spoliation only where the

---

regardless of whether Rule 37(e) or the court's inherent authority governs, the court properly draws an adverse inference against Attorney Harp.

20

absence[] of that evidence is predicated on bad faith, such as where a party purposely loses or destroys relevant evidence." *Penick*, 481 F. Supp. 3d at 1292 (citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)) (internal quotation marks and brackets omitted).

If direct evidence of bad faith is unavailable, the moving party may establish bad faith through circumstantial evidence. *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017), *aff'd*, No. 20-11141, 2022 WL 433457 (11th Cir. Feb. 14, 2022). Circumstantial evidence of bad faith includes:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Id.* (quoting *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1323 (S.D. Fla. 2010)).

Where the court finds that an attorney has engaged in spoliation of evidence, the court may use its inherent authority to sanction that attorney. *Skanska USA Civ. Se. Inc.*, 75 F.4th at 1311. In doing so, the court may make an adverse inference against the spoliating attorney. *Martinez v. Brink's, Inc.*, 171 F. App'x 263, 268 n.7 (11th Cir. 2006). "The adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party

21

engaging in the misconduct." *F.T.C. v. First Universal Lending, LLC*, 773 F. Supp. 2d 1332, 1352 (S.D. Fla. 2011).

### ii.    Findings as to Attorney Harp

Here, the first two elements are easily met. First, Attorney Harp had a ChatGPT account until April 23, meaning his ChatGPT history was available to him until that date. On April 23, he deleted his account, meaning he would lose access to his ChatGPT history on April 30. But on April 23, he took the additional step of requesting a prorated refund for the remaining portion of the billing period and thus cutting off his access immediately. As to the second element, the court ordered Attorney Harp to produce his ChatGPT history on April 20, creating an unambiguous duty to preserve that evidence. *See In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. at 185.

The third element requires the moving party to show that the destroyed evidence was crucial to its case. Here, there is no moving party—the court is sanctioning *sua sponte*. The court ordered Attorney Harp to produce his ChatGPT history in order to determine whether he had submitted hallucinated AI quotations to the court as part of a sanctions inquiry distinct from the underlying case. Attorney Harp's ChatGPT history is, of course, crucial to that inquiry.

The court also finds that Attorney Harp acted in bad faith. The epitome of bad faith is "where a party purposely loses or destroys relevant evidence," *Penick*, 481

22

F. Supp. 3d at 1292 (citing *Bashir*, 119 F.3d at 931), which is precisely what Attorney Harp did here. Knowing that he had a duty to preserve and produce evidence that was highly relevant to the court's inquiry, he knowingly and intentionally deleted that evidence, and he has been unable to proffer any reason beyond bad faith for his actions. *See Alabama Aircraft Indus., Inc.*, 319 F.R.D. at 746. Therefore, bad faith is established.

### iii.    Sanctions

Because the court finds that Attorney Harp in bad faith engaged in spoliation of evidence, it may make an adverse inference against him. *Skanska USA Civ. Se. Inc.*, 75 F.4th at 1311. Accordingly, the court draws an adverse inference against Attorney Harp and concludes that his ChatGPT account, had he not deleted it, would have shown that the four quotations at issue—and likely other statements of law that the court drew to Attorney Harp's attention as incorrect, *see, e.g.*, Hearing Transcript at 12–13—were generated by ChatGPT.

### B. Civil Contempt

A civil contempt judgment is appropriate when an attorney fails to comply with a court order. *See, e.g.*, *United States v. Coulton*, 594 F. App'x 563 (11th Cir. 2014).

### i.      Sanctioning Authority

This court has the inherent authority to enforce its own orders by the exercise of contempt powers. *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir. 1991) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Under Eleventh Circuit precedent, the court may "make a finding of civil contempt—that is, willful disregard of the authority of this Court—only upon a showing that the alleged contempt is clear and convincing." *Georgia Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007) (emphasis omitted). "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Id.*

> In determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation, though it may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard. Moreover, we will construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt. Our focus in a civil contempt proceeding is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue.

*Id.* (internal quotation marks and citations omitted).

Due process requires that a civil contempt defendant receive notice and an opportunity to be heard. *F.T.C. v. Leshin*, 719 F.3d 1227, 1235 (11th Cir. 2013). But "the requirements of due process in a civil contempt proceeding are flexible, varying

with the circumstances of each case." *In re McLean*, 794 F.3d 1313, 1324 (11th Cir. 2015) (quoting *Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990)) (brackets omitted). As long as the civil contempt defendant has some opportunity to respond, "when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him." *In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019) (quoting *In re McLean*, 794 F.3d at 1324 n.4).

### ii.    Findings as to Attorney Harp

Here, the court informed Attorney Harp of the alleged contemptuous conduct on May 4, 2026, in the form of a Show Cause Order, (doc. 35), and Attorney Harp filed a Response to that Order on May 11, 2026, (doc. 36). He stated in that Response, "I have reviewed the Court's show cause order (Doc. 35) and can offer no grounds for the avoidance of sanctions and a finding of civil contempt other than the information I have previously provided." *Id.* at 1. He further stated that "at some point after the hearing, for the reasons previously given, I deleted my ChatGPT account." *Id.* at 2. This leaves no disputed factual matters that require an evidentiary hearing. Attorney Harp has been provided with notice and an opportunity to be heard, and thus due process is satisfied. *In re Roth*, 935 F.3d at 1278.

The elements of civil contempt are also satisfied. As to the first element, the Order in question—the court's April 20, 2026, production order, (doc. 31)—was

25

valid and lawful. That order was issued as part of an investigation into Attorney Harp's sanctionable conduct, and courts have broad inherent authority to conduct independent investigations to determine whether attorneys or parties have engaged in misconduct. *See Chambers*, 501 U.S. at 44. "[N]either party challenges whether the Court's Orders at issue are valid and lawful, and there is no basis for finding otherwise." *Stratos v. AIG Prop. Cas. Co.*, No. 21-cv-23018, 2024 WL 2782195, at *10 (S.D. Fla. Feb. 5, 2024).

The second element—that the order be clear and unambiguous—is likewise satisfied. The order unambiguously required Attorney Harp to produce "[s]creenshots of Attorney Harp's ChatGPT history showing the entirety of all conversations related to this case." (Doc. 31). The order must be construed using an objective standard, *Georgia Power Co.*, 484 F.3d at 1291, and, objectively, there is only one way to read this: Attorney Harp was required to provide the screenshots. Thus, the order was clear and unambiguous.

Finally, the third element—that the alleged violator had the ability to comply with the order—is met. Attorney Harp admits that he did not delete his ChatGPT account until after the hearing, which was held the same day—April 20—as the court ordered him to submit the screenshots. Furthermore, his submitted emails show that he deleted his ChatGPT account on April 23, three days after being ordered to submit his ChatGPT history. Finally, he would have maintained access to his ChatGPT

26

account and thus would have maintained the ability to comply with the court's order until April 30—one day beyond the court's April 29 deadline for turning over his ChatGPT history—but he requested and received a prorated refund for the remaining portion of the billing period rather than maintaining access through April 30. This demonstrates that Attorney Harp had the ability to comply with the court's order, but rather than doing so, he took multiple steps to delete the evidence requested by the court. The third element is met.

Accordingly, all of the requirements for a finding of civil contempt are met: the court issued a valid and unambiguous order for Attorney Harp to submit his ChatGPT history, Attorney Harp had the ability to comply with the court order, and Attorney Harp did not comply, choosing instead to destroy the evidence that the court ordered him to produce. Attorney Harp's due process rights have been protected, and the court hereby finds him in civil contempt of court.

### iii.    Sanctions

Although the elements of civil contempt are satisfied, "[t]he purpose of civil contempt *sanctions* is to (1) compensate the complainant for losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996) (emphasis added). No party suffered losses or expenses due to Attorney Harp's contemptuous act—excepting the significant time spent by the court on this

27

issue, for which it will not pursue reimbursement—and Attorney Harp cannot now be coerced into complying with the production order, as he has destroyed the evidence that was to be produced. Accordingly, the court finds counsel in civil contempt for violating its lawful orders and separately exercises its inherent authority to protect the integrity of judicial proceedings and vindicate the authority of the court. *See* Section II(C), *infra*.

## C. Court's Inherent Authority

The sanctions imposed thus far leave a significant disciplinary gap, circling the issue without addressing it directly. Rule 11 allows the court to sanction Attorney Harp for making false representations to the court. Spoliation allows the court to draw an adverse inference against Attorney Harp, but it introduces no real standalone sanctions for the destruction of evidence. Civil contempt allows the court to enforce its orders but does not allow for other sanctions beyond forcing compliance and compensating injured parties for their losses, neither of which are helpful here. Thus, none of these address the elephant in the room—that Attorney Harp in bad faith destroyed evidence that the court had explicitly ordered him to produce. Such behavior cannot go undisciplined.

### i.    Sanctioning Authority

As this court has previously explained it,

"Courts have long recognized an inherent authority to suspend or disbar lawyers derived from the lawyer's role as an officer of the court which

28

granted admission." *In re Snyder*, 472 U.S. 634, 643 (1985). Thus, "a federal court has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. 529, 530 (1824)). "An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." *Connick v. Thompson*, 563 U.S. 51, 66 (2011).

. . . "[T]he inherent power extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46. "A court must exercise caution in invoking its inherent power," and "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* at 50. "If in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. The Supreme Court has held that even "particularly severe sanctions" are "within the court's discretion." *Id.* at 45 (discussing "outright dismissal of a lawsuit" as a sanction). A finding of subjective bad faith or something tantamount to it is necessary to support a sanction issued pursuant to a court's inherent power. *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).

*Johnson*, 792 F. Supp. 3d at 1258–59 (brackets and ellipses omitted).

### ii.    Findings as to Attorney Harp

This is precisely such a case in which the court's other sanctioning powers are not "up to the task." *Chambers*, 501 U.S. at 46. Thus, the court, having already made a finding that Attorney Harp acted in bad faith in deleting his ChatGPT account, *see* Section II(A)(ii), *supra*, "may safely rely on its inherent power." *Id.*

29

### iii.    Sanctions

The court finds a public reprimand with a limited publication requirement to be fitting.[6] "[I]t makes other clients, counsel, and courts aware of the lawyer's misconduct so that they may assess whether any measures are needed to protect their proceedings." *Johnson*, 792 F. Supp. 3d at 1267. Disqualification is also necessary: "lawyers should know that if they [commit such misconduct], they will no longer have the professional opportunity to participate in those proceedings."[7] *Id.* at 1266. Additionally, "the referral to licensing authorities is a bare minimum in the light of the primary nature of a lawyer's professional responsibility" not to flout court orders and destroy evidence. *Id.* at 1267.

Finally, the court finds suspension from practice in the Northern District of Alabama to be appropriate. The court does not come to such a conclusion lightly. "[T]he power to disbar is one that ought always to be exercised with great caution; and ought never be exercised except in *clear* cases of misconduct, which affect the standing and character of the party as an attorney." *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1562 (11th Cir. 1997) (quoting *Ex parte Wall*, 107 U.S. 265,

---

[6] This is the same sanction that the court imposes under Rule 11 for Attorney Harp's misrepresentations to the court. *See* Section I(C), *supra*. Of course, this does not require Attorney Harp to publish twice, as one single publication will give effect to the two sanctions.

[7] Attorney Harp's misconduct has no effect on any decision the court has made or will make as to the merits of Ms. Miller's underlying case, as there is no indication that Ms. Miller was involved in any way in such misconduct.

288 (1883)) (brackets omitted). Suspension is proper if "the attorney can be deemed to have been on notice that the courts would condemn the conduct for which he was sanctioned. This would necessarily include behavior which responsible attorneys would recognize as improper for a member of the profession." *In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990) (citing *In re Ruffalo*, 390 U.S. 544, 554–55 (1968) (White, J., concurring)).

Attorney Harp's is a clear case of misconduct which indeed affects his standing and character as an attorney. If the court cannot trust an individual not to destroy evidence, that individual must not be allowed to practice in front of that court. It goes without saying that responsible attorneys would recognize Attorney Harp's behavior as improper for a member of the profession.

The court considered lesser sanctions but concludes that they are inadequate given the combination of false statements to the court, lack of candor during the ensuing inquiry, and intentional destruction of evidence after a direct court order. It is vital that lying, destroying evidence, or otherwise obfuscating the truth in an AI-related inquiry result in greater sanctions than does simply making misrepresentations to the court, due to AI usage or otherwise. If such behavior does not lead to rapidly escalating sanctions, lawyers will have no incentive to be candid with the court when they are caught making such misrepresentations in their filings. It is essential, then, that the sanctions imposed for obstructing the court's

31

investigation be severe enough to dissuade others from conducting themselves in such a manner. Accordingly, Attorney Harp is suspended from practicing in the Northern District of Alabama for a period of six months.

## CONCLUSION

The court is not ordering the harshest of Attorney Harp's sanctions because he made a mistake. The court is ordering them because, when confronted with that mistake, he chose dishonesty over candor and destruction over disclosure.

Lawyers make errors. Competent and ethical lawyers own them.

When lawyers are caught submitting AI-generated misrepresentations to the court, they have two options: they can either admit to their mistakes and show contrition, or they can attempt to cover up their mistakes and demonstrate a weakness of character unsuited to the legal profession. If they choose the former path, they will likely preserve their standing before the court. If they choose the latter, they may well lose their career.

The court sincerely wishes that Attorney Harp had chosen the former path rather than the latter, and it warns anyone who may find themselves in a similar position to carefully consider the consequences of their next move and to confront their situation with upfront honesty and contrition. Any lawyer who believes this court will hesitate to vigorously investigate and impose career-altering sanctions for such misconduct is gravely mistaken.

Accordingly, the court **ORDERS** as follows:

1. The court **PUBLICLY REPRIMANDS** Attorney Harp for his misconduct described in this order;

2. To effectuate his reprimand, Attorney Harp is **ORDERED** to provide a copy of this Order to his clients, opposing counsel, and presiding judge in every pending state or federal case in which he is counsel of record. He must comply with this requirement within ten days from the date of this Order and must certify to the court within twenty-four hours of that compliance that the requirement has been met;

3. To further effectuate the reprimand and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement;

4. Attorney Harp is **DISQUALIFIED** from further participation in this case. All deadlines are **STAYED** for sixty days to allow Ms. Miller time to associate new counsel, should she so desire;

5. Attorney Harp is **SUSPENDED** from practice in the United States District Court for the Northern District of Alabama for a period of six months. This suspension is effective fourteen days from the entry of this Order;

6. Attorney Harp is **DIRECTED** to provide the Clerk of Court with a listing of jurisdictions in which he is licensed to practice law within twenty-four hours of this Order; and

7. The Clerk of Court is **DIRECTED** to serve a copy of this order on the General Counsel of the Alabama State Bar and any other applicable licensing authorities for further proceedings as appropriate.

**DONE** and **ORDERED** on May 21, 2026.

_____
**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE