FILED

2026 Jul-21  AM 10:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**JACKIE L. MILLER,**

 **Plaintiff**,

**v.**

**REGIONS BANK,**

 **Defendant**.

**Case No. 2:24-cv-1324-HDM**

### <u>MEMORANDUM OPINION</u>

Plaintiff Jackie Miller sues her former employer, Defendant Regions Bank ("Regions"), for alleged violations of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). (*See* Doc. 1). Specifically, Miller alleges that Regions: (1) violated the ADA by failing to provide her with a reasonable disability accommodation (Count I); (2) violated the ADA by retaliating against her for requesting disability accommodations (Count II); and (3) violated the FMLA by retaliating against her for taking protected leave (Count III). (Doc. 1-1 at 16–18). This case is before the court on Regions' Motion for Summary Judgment, (doc. 19), which, for the reasons stated below, the court **GRANTS**.

## BACKGROUND

On March 27, 2017, Regions hired Plaintiff Jackie Miller as a Compliance Specialist. (Doc. 21, ¶ 1). In October 2018, Miller's title was changed to Business Unit Compliance Administrator. *Id.*, ¶ 2; (Doc. 23, ¶ 2). In this role, she was responsible for understanding rules and regulations, training others in her assigned areas, performing administrative duties, and advising on compliance issues. (Doc. 21, ¶ 3). Miller was required to prepare reports for Regions relating to her supervisory monitoring and testing functions. *Id.*

In early 2021, Miller began reporting to Amanda McMinn, the Business Unit Compliance Manager, who served as her manager from February 2021 to August 2022. *Id.*, ¶ 4. In May 2021, Miller discussed with McMinn her desire to focus only on projects and not perform any monitoring and testing functions. *Id.*, ¶ 5. McMinn told her that, for the foreseeable future, everyone, including Miller, would have to continue performing monitoring and testing functions. *Id.* In December 2021, McMinn and Miller met and created a list of priorities to help Miller better manage her tasks, which Miller suggested would be helpful. *Id.*, ¶ 6. McMinn also offered to help Miller manage her deadlines by setting internal deadlines before the external ones. *Id.*, ¶ 9.

In Miller's 2021 performance review meeting, McMinn and Miller discussed ways Miller could improve her performance, including better prioritization and time

management. *Id.*, ¶ 7. Miller was also counseled about her habit of interrupting individuals in meetings. *Id.* In Miller's 2021 review, McMinn noted that "[b]eing an administrator, [Miller] is responsible for projects in addition to testing and monitoring activities." *Id.*, ¶ 8. Despite McMinn's efforts to provide coaching and feedback, Miller's performance did not improve.[1] *Id.*, ¶ 12. In March 2022, Miller completed a feedback survey on McMinn, (doc. 20-2 at 16-17), and, while her feedback was mostly positive, Miller said that McMinn only "sometimes" used a "strength-based" and "development-minded" leadership style, *id.* at 15.

In April 2022, McMinn and Miller met again to discuss Miller's performance. (Doc. 21, ¶ 15). At that meeting, which Miller recorded, Miller told McMinn that a log or spreadsheet would help her prioritize projects. *Id.* In that same meeting, McMinn made it clear to Miller that there would always be some level of monitoring and testing duties necessary as part of Miller's administrator job. *Id.* McMinn also placed Miller on a performance improvement plan. (Doc. 21-1 at 168). Miller's plan listed seven "expectations" that would, if met, improve her performance: (1) "Communicate in an effective manner which includes written and verbal

---

[1] Under the initial order entered in this case, "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 4 at 17). Miller did not controvert that "[her] performance did not improve," and accordingly, the court deems it admitted. *Id.*; *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

communication skills"; (2) "Ensure desk procedures for all assigned activities are complete and saved on the Surveillance shared drive"; (3) "Ensure all monitoring/testing activities are completed timely and entered into SharePoint"; (4) "Ensure projects assigned are completed in an organized, steady manner"; (5) "Ensure time is spent on tasks/projects assigned and prioritized and not on items that have not been discussed"; (6) "Manage time and resources to ensure that work is completed efficiently [and] work with manager on an ongoing basis to agree upon prioritization of duties"; and (7) "Avoid waiting until due date to complete items[,] acknowledging that items will come up that require immediate attention[,] [and] work with manager to set micro-deadlines to keep deliverables on schedule." *Id.* at 168–69.

The plan also listed five "activities/behaviors" that Miller should adopt: (1) "In all meetings (in person or virtual), allow others the opportunity to speak without interruption and maintain awareness of the purpose of the meeting to remain on topic"; (2) "Per previous conversations, desk procedures were to be completed as of 12/31/21. There are currently 10 incomplete desk procedures. These should be completed and saved on the Surveillance shared drive by 4/22/2022"; (3) Recurring monitoring/testing activities should be completed [in accordance with the designated schedule]"; (4) Completion of Miller's then-currently assigned projects; and (5)

4

"Discuss with manager if you are approached about a new work item or if you identify something that needs to be addressed." *Id.* at 169–71.

Finally, the plan listed McMinn's commitments to help Miller improve her performance: (1) "Continue our bi-weekly 1:1 meetings and make myself available and respond timely at any other time I am needed"; (2) "Assist on setting micro-deadlines for any ongoing projects"; (3) "Assist in prioritizing tasks that have been assigned"; and (4) "Provide timely feedback if communication issues are witnessed." *Id.* at 171. The plan also warned Miller that "[f]ailure to meet expectations outlined in this plan as well as failure to maintain all other standards of performance associated with [her] role could result in disciplinary action." *Id.*

In Miller's feedback on her performance improvement plan, she referenced the fact that she has ADHD. *Id.*, ¶ 16. In response to the request that she stop interrupting others and remain on topic in meetings, Miller agreed this was an "acceptable expectation of her Manager." *Id.* However, she notes that she "was diagnosed with ADHD in 2003 and was prescribed medication at that time . . . which she ingest[s] daily" and that her medication was changed in March 2022 after almost 20 years. *Id.* Regions' human resources group contacted Miller to remind her how to request an ADA accommodation should she feel the need for one. *Id.*, ¶ 17. Miller did not request any accommodation at that time. *Id.*

In June 2022, to emphasize to Miller that her performance had not sufficiently improved since the performance-improvement plan was implemented in April 2022, Miller's second-level manager, Denise Morrison, and McMinn met with Miller to deliver a verbal warning on Miller's unsatisfactory performance. *Id.*, ¶ 19. By this time, Miller felt she was being intentionally pushed out of her role and was being criticized because of the feedback she provided about McMinn on the March 2022 survey. *Id.*, ¶ 20.

Following that meeting, Miller submitted a request to be relieved of her monitoring and testing functions as a medical accommodation for her ADHD. *Id.*, ¶ 21. Soon thereafter, Elbony Cole, an Accommodation and Leave Analyst for Regions, informed Miller that it would not be possible to remove all monitoring and testing activities, as these were essential functions of her role. *Id.*, ¶ 22. Cole offered to provide the following alternative "accommodation" on behalf of Regions: "Weekly 1:1s with her manager (to level set expectations, ask questions, etc.), date range communication for deadlines, referral to Degreed resources (e.g., Prioritization and Time Management courses), and/or referral to the FMLA process." *Id.* Cole asked Miller to identify which of the offered accommodations she wished to have implemented by July 1, 2022, *id.*, but Miller did not do so. On July 12, 2022, Miller requested Cole's assistance in applying for FMLA leave. *Id.*, ¶ 24. Regions approved Miller's request for FMLA leave, which was to begin on July 20,

6

2022, and extended her deadline for selecting from among the accommodations offered by Cole to July 15, 2022. *Id.* On July 13, 2022, Miller received a written warning for continued issues with her work performance. *Id.*, ¶ 23.

After commencing in July, Miller's leave continued through October 14, 2022. *Id.*, ¶ 25. On July 18 (before her leave began), she informed Cole that she preferred to discuss the accommodations after her return from FMLA leave. *Id.*, ¶ 26. Cole informed Miller that she would be closing the accommodation request but would reopen it if she wished to discuss accommodations upon her return. *Id.*

While Miller was on leave, Regions discovered the extent to which she had not been fulfilling her job duties, which included incomplete tasks that left Regions at risk for operational losses and compliance violations. *Id.*, ¶ 31. Prior to Miller's return from leave, Melissa Crump assumed the role of Business Unit Compliance Manager, replacing Amanda McMinn, and became Miller's new manager. *Id.*, ¶ 28.

Upon her return from leave, Miller requested and was permitted to continue working from home, as she had been doing since December 2021, and was invited to re-engage with the ADA process for any other accommodations she needed. *Id.*, ¶¶ 27, 29. She told Crump that she did not want to perform tasks related to monitoring and testing, but Crump explained to her that it was an important part of her role as a member of the surveillance team. *Id.*, ¶ 30. Crump allowed Miller to

focus on only one segment of the business—banking—and held off on giving Miller new assignments while she transitioned back to work. *Id.*

In November 2022, individuals from Regions' Associate Relations group met with Miller to discuss tasks that Miller had left unfinished while she was on leave that created unnecessary risks and inefficiencies. *Id.*, ¶ 32. They allowed her to present any documents she wished to, and they met with her a second time later that month. *Id.* Following the Associate Relations review, Miller received a final written warning on December 8, 2022. *Id.*, ¶ 33. The final written warning noted that "[p]rior to [the FMLA leave], several areas for which [Miller was] responsible had missing or incomplete tasks which left the Wealth Management group at risk . . . . [F]ailure to achieve and sustain improvement in this area or to maintain all standards of performance for [her] position [would] result in further disciplinary action, up to and including termination of employment . . . ." *Id.*, ¶ 34.

On February 8, 2023, during a call with approximately 250 to 300 of Regions' Wealth Associates, Miller provided inaccurate information while discussing the consequences for customers who opted out of email communications from Regions, which was a part of her assigned "CAN-SPAM" project. *Id.*, ¶ 35. Her mistake raised significant concerns across Regions. *Id.*, ¶ 36. After receiving numerous questions and communications related to the inaccurate information, Regions management was forced to issue a mass communication addressing and correcting Miller's

misstatement. *Id.* The next day, Crump learned that Miller had also failed to adequately document and escalate a potential regulatory issue before taking FMLA leave. *Id.*, ¶ 37. Regions terminated Miller's employment on March 3, 2023, as a result of her unsatisfactory performance.[2] *Id.*, ¶ 38.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). A genuine dispute of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment always bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[2] This fact is deemed admitted for purposes of Regions' Motion for Summary Judgment. *See* Footnote 1, *supra*.

## DISCUSSION

In her Complaint, Miller asserts three causes of action: (1) ADA discrimination, by failing to accommodate her ADHD (Count I); (2) ADA retaliation, by asking her to perform menial tasks and removing job duties in retaliation for requesting an accommodation (Count II); and (3) FMLA Retaliation, by terminating her employment and taking other adverse actions in retaliation for taking protected leave (Count III). (Doc. 1-1 at 16–18). There is no genuine issue of material fact as to any of these claims, and Regions is entitled to judgment as a matter of law.

## I.      Count I: ADA Failure to Accommodate

In Count I, Miller alleges that Regions discriminated against her in violation of the Americans with Disabilities Act ("ADA") by failing to provide her requested disability accommodation. (Doc. 1-1 at 16). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023). Miller cannot establish a *prima facie* case of discrimination because she has not proven that she is disabled under the ADA or, alternatively, because she cannot establish that she was discriminated against.

### A. Miller Has Not Shown that Her ADHD Rendered Her Disabled Within the Meaning of the ADA

In her Complaint, Miller claims that she is disabled due to her ADHD and that she requested accommodations on that basis. (Doc. 1-1, ¶¶ 109, 120). Under the ADA, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities" of an individual. 42 U.S.C. § 12102(1)(A); *see also Simpson v. Ala. Dep't of Hum. Res.*, 311 F. App'x 264, 267–68 (11th Cir. 2009) (per curiam). The ADA Amendments Act of 2008 broadened this definition and directed that the term "substantially limits" be interpreted consistently with that revised definition. 42 U.S.C. § 12102(4)(B). Major life activities include "learning, reading, concentrating, thinking, communicating, interacting with others, and working." 28 C.F.R. § 1630.2(i)(i).

While ADHD can—if sufficient evidence is presented—constitute a disability under the ADA, an ADHD diagnosis does not automatically mean that an individual is substantially limited in a major life activity. *Simpson*, 311 F. App'x at 267 (affirming a grant of summary judgment because the plaintiff's ADHD diagnosis did not automatically render him disabled); *Williamson v. Clarke Cnty. Dep't of Hum. Res.*, 834 F. Supp. 2d 1310, 1319 (S.D. Ala. 2011) ("[A] mere diagnosis of ADHD, without more, may not suffice to establish disabled status under the ADA."). The plaintiff must produce evidence in the form of a "record of impairment" that her ADHD substantially limits a major life activity. *Simpson*, 311 F. App'x at 268 ("In

11

short, [the plaintiff] has no case of discrimination based on a record of impairment."). *See also Todd v. McCahan*, 158 F. Supp. 2d 1369, 1378 (N.D. Ga. 2000) (holding that an employee with ADHD was not disabled where there was "no evidence that ADHD substantially affect[ed] his ability to learn or work").

Miller claims that her ADHD impacted her concentration at work and that she "has offered medical evidence and testimony supporting such limitations," (doc. 23 at 22), but she cites no such evidence. While ADHD can qualify as a disability under the ADA, Miller's ADHD only qualifies as such if it substantially limits her major life activities, but she has failed to create a genuine factual dispute on this point sufficient to defeat summary judgment.[3] Because Miller has cited no evidence demonstrating that her ADHD substantially limited a major life activity, she cannot be considered "disabled" under the ADA. Accordingly, her ADA failure to accommodate claim fails as a matter of law.

## B. Miller Cannot Establish that She was Discriminated Against

Even assuming Miller's ADHD rendered her disabled within the meaning of the ADA, Miller's claim still fails because she cannot satisfy the third element of her

---

[3] Indeed, Miller's sworn testimony indicates that her ADHD has *not* limited her ability to perform major life activities in any substantial or relevant way. (Doc. 20-1 at 19). She states that she did not "have any issues doing [her] job adequately as a result of [her] ADHD during [her] first five years with Regions," her ADHD had never caused her to miss deadlines prior to 2022, she was "able to successfully perform [her previous] jobs at ProEquities and Protective Life," where she got good performance reviews and was never placed on a performance improvement plan, and she does not know if her ADHD "impact[ed] [her] ability to regulate how [she] communicate[d] with others." *Id.*

*prima facie* case—that she was "discriminated against because of [her] disability." *Beasley*, 69 F.4th at 754.

"Under the ADA unlawful discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability' unless doing so 'would impose an undue hardship' on the employer." *Id.*(quoting 42 U.S.C. § 12112(b)(5)(A)). To make this showing, the burden is squarely on Miller to (1) "identify an accommodation that would allow her to perform her job duties" and (2) "establish that such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).

Miller bases her ADA discrimination claim entirely on Regions' failure to eliminate the monitoring and testing functions as she requested. (Doc. 1-1, ¶¶ 110–13); *id.* at 72, 85. She cannot satisfy her showing that her requested accommodation was "reasonable" because it was a request to eliminate essential functions of her position. *See Beasley*, 69 F.4th at 758–59. A request to accommodate a plaintiff's disability by eliminating essential functions of her position is unreasonable as a matter of law and, under Eleventh Circuit precedent, the ADA does not require such an accommodation. *Id.* (holding that "the ADA did not require the employer to restructure [a job] in a way that would eliminate its essential functions" because doing so "would have changed the nature of the job, and that is not something the

13

ADA requires") (internal quotation marks omitted). Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Id.* (citing 29 C.F.R. § 1630.2(n)(2)(1)). To assess what constitutes an essential function, courts defer to the employer's assessment, *id.* at 760 (citing 42 U.S.C. § 12111(8)), which includes the opinion of the plaintiff's supervisor. *Id.*; *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007). The court may also consider an official job description. *Beasley*, 69 F.4th at 761.

Here, monitoring and testing duties were essential functions of Miller's Business Unit Compliance Administrator position. This is indicated by the job description, which states that Miller "[a]dministers a monitoring and testing program to ensure effective compliance with all applicable laws and regulations." (Doc. 20-1 at 119–20). Miller told her manager in a recorded conversation that she had fourteen monitoring and testing functions that were a part of her daily activities. *Id.* at 71. Indeed, she admits her monitoring and testing responsibilities occupied forty percent "or more" of her time since 2019. *Id.* at 30.[4]

---

[4] Miller stated two separate times in her sworn deposition that "a good 40 percent or more" of her workweek was devoted to monitoring and testing activities, (doc. 20-1 at 28, 31), yet she argues in her Response Brief that only a small portion of her overall hours were spent performing monitoring and testing functions, (doc. 23 at 23). In making this argument, she cites only her Declaration, (doc. 24, ¶ 44), and a declaration cannot directly contradict the declarant's prior sworn statement in order to create the illusion of a factual dispute, *Garth v. TVA Bd. of Dirs.*, No. CV-08-S-01593-NW, 2012 WL 13089808, at *1 (N.D. Ala. Mar. 21, 2012).

14

Although her position could evolve to entail more projects and fewer administrative functions, her managers were clear with Miller that there would "always be some level of testing and monitoring" in her role. *Id.* at 72. Another manager told her, "We are a monitoring and testing program. . . . [T]here's really no way getting around that. It's literally what our program is, it's a monitoring and testing [program]." (Doc. 20-4 at 9). This is precisely what Regions' accommodations specialist told Miller in response to her request to remove her monitoring and testing duties—that her request was to remove essential duties of her position and was, therefore, not a reasonable accommodation. (Doc. 20-2 at 81). Miller's subjective belief that monitoring and testing were not essential to her position is not relevant to the analysis, as deference is given to the employer's determination of what constitutes the essential functions of the job, *see Beasley*, 69 F.4th at 760 (citing 42 U.S.C. § 12111(8)), not the employee's. The evidence that Miller has presented does not create a genuine dispute of material fact regarding whether monitoring and testing duties were essential functions of her position.

Regions is therefore entitled to summary judgment on Count I because Miller has provided no evidence that she is disabled within the meaning of the ADA and her claim is premised entirely on Regions' denial of her request to remove essential functions of her position.

15

## II.    Count II: ADA Retaliation

In Count II, Miller alleges that Regions retaliated against her in violation of the ADA when it took certain actions against her after she requested disability accommodations. (Doc. 1-1 at 17). To establish a *prima facie* case of ADA or FMLA retaliation, a plaintiff must demonstrate: "(1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). Only the second and third prongs are at issue here.[5]

As to the second prong—whether she suffered an adverse employment action—Miller claims that, following her accommodations request, she was subject to retaliatory disparate treatment by being "given menial tasks to perform," being "required to keep an activity log," and having "duties and tasks previously assigned

---

[5] As to the first prong, Miller need not prove that she was actually disabled or discriminated against because of that disability in order to show that she engaged in statutorily protected activity. *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 357 (11th Cir. 2005) (per curiam). Rather, she must "show that [s]he *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, [and] that [her] belief was *objectively* reasonable in light of the facts and record presented." *Id.* (quoting *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997)). Accordingly, if Miller's "belief, though perhaps mistaken, was objectively reasonable," she satisfies the first prong. *Id.* "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Id.* (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)). The court need not determine whether Miller's belief that she was discriminated against on account of a disability was objectively reasonable in light of existing substantive law, as her retaliation claim fails the second and third prongs of the test.

16

to her taken away from her."[6] (Doc. 1-1, ¶¶ 118–20). None of these challenged acts qualify as adverse employment actions as required to support an ADA retaliation claim.

An "adverse employment action must be material, meaning it must be one that 'could well dissuade a reasonable worker' from engaging in protected activity." *Wood v. Gilman Bldg. Prod. Inc.*, 769 F. App'x 796, 802 (11th Cir. 2019) (per curiam) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).[7] Trivial harms, petty slights, or minor annoyances are insufficiently dissuasive to qualify as adverse employment actions. *See Fortner v. DeJoy*, No. 2:19-cv-01409, 2022 WL 4591647, at *20 (N.D. Ala. Sept. 29, 2022), *aff'd sub nom. Fortner v. Brennan*, No. 22-13688, 2023 WL 8813574 (11th Cir. Dec. 20, 2023) (holding that undesirable work assignments, performance and attendance reviews,

---

[6] Miller, in her complaint, alleges that her termination was in retaliation for taking FMLA leave, (doc. 1-1 at 18), but she does not allege that she was terminated in retaliation for her ADA request, *see id.*, ¶¶ 116–21. She argues in her Response Brief, however, that her termination is a basis for her FMLA *and* ADA retaliation claims. (Doc. 23 at 28–29, 31). Her termination is not properly before the court on the issue of ADA retaliation because "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). The Eleventh Circuit has held that a plaintiff may not rely at summary judgment on a new factual basis for a retaliation claim when the complaint expressly grounded that claim on different facts, even if the omitted facts were alleged elsewhere in the complaint. *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014).

[7] For both ADA and FMLA retaliation claims, the Eleventh Circuit has applied the definition of adverse employment action found in the Title VII retaliation context. *See Jones v. Aaron's Inc.*, 748 F. App'x 907, 917 (11th Cir. 2008) (per curiam) (FMLA retaliation); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (ADA retaliation).

and a recommended weeklong suspension were not materially adverse for a retaliation claim).

Miller identified a single "menial task": her manager asking her to "go into a system called One View and look up some information [her manager] received." (Doc. 20-1 at 86–87). This task took "pretty much the [rest of the] day" to complete. *Id*. at 86. A manager's one-time request that an employee-plaintiff look up information in order to assist the manager with a task does not rise to the level of an adverse employment action, regardless of whether the plaintiff viewed that task as menial. Instead, it falls squarely within the category of "minor annoyances . . . common to the everyday workplace." *See Byrd v. Gwinnett Cnty. Sch. Dist.*, 728 F. Supp. 3d 1257, 1267 (N.D. Ga. 2024). Miller's single identified menial task falls far short of qualifying as an adverse employment action.

Likewise, McMinn's directive that Miller maintain an assignment log does not qualify as an adverse employment action for purposes of her ADA retaliation claim. This was a shared log showing Miller's current projects and assignments to which her manager had access. (Doc. 20-1 at 87). Miller had previously kept such a log after *suggesting* that it would help her prioritize tasks. *Id.* at 61. The implementation of a shared log to identify and prioritize projects—which the employee previously indicated would be helpful—is not an adverse employment action as required to support an ADA retaliation claim.

18

Finally, Miller's claim that Regions removed tasks from her workload does not qualify as an adverse employment action. When questioned about what tasks management removed, she pointed to the removal of a single step of a project. *Id.* at 86. Reassignment of a portion of the project would not dissuade a reasonable employee from engaging in protected activity, particularly when the undisputed facts demonstrate that the employee consistently struggled to manage the workload that management did assign to her. (*See, e.g.*, Doc. 20, ¶ 7 ("In her 2021 performance review meeting, McMinn and [Miller] discussed ways [Miller] could improve her performance, including better prioritization and time management.")). Regardless, this reassignment—even if viewed as harmful rather than helpful to Miller—is nothing more than a "trivial harm[]" and is thus insufficient to establish an adverse employment action. *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 715 (11th Cir. 2013) (per curiam) (quoting *Burlington N.*, 548 U.S. at 54).

There is no evidence that any of these challenged acts—considered separately or together—harmed Miller at all, much less caused the degree of harm or injury that would dissuade a reasonable employee from making or supporting a charge of discrimination. Accordingly, there are no genuine issues of material fact on this issue

19

and Regions is entitled to judgment as a matter of law on Count II.[8] *See Batson*, 897 F.3d at 1329.

## III.    Count III: FMLA Retaliation

Finally, in Count III, Miller claims Regions violated the Family and Medical Leave Act ("FMLA") by retaliating against her for taking medical leave by: (1) "having tasks taken away and given to other employees"; (2) being "made to maintain daily logs and journals that documented her work"; (3) being issued "write-ups and verbal warnings" and (4) ultimately being terminated. (Doc. 1-1, ¶¶ 124–26).

To establish a *prima facie* case of FMLA retaliation in the Eleventh Circuit, an employee must prove: (1) she engaged in an FMLA-protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *Batson*, 897 F.3d at 1329. If the employee can make out a *prima facie* case, the burden shifts to the employer to demonstrate that the adverse employment action was not retaliatory. *Id*. Regions does not challenge that Miller engaged in FMLA-protected activity when she took FMLA leave. (*See* Doc. 21 at 35–42). Accordingly, only the second and third prongs are at issue.

---

[8] Miller has also failed to put forth evidence sufficient to demonstrate that she was terminated for any retaliatory reason. *See* Section III(B), *infra* (listing undisputed facts making it clear that no reasonable jury could find that Miller was "retaliated against" for any reason other than her inadequate performance). Thus, Miller fails the third element—causal connection—as well.

### A. Miller Can Establish an Adverse Employment Action

As explained above, requiring Miller to keep an activity log and removing certain of her duties does not qualify as an adverse employment action. *See* Section II, *supra.* In Count III, Miller also claims that she was issued "write-ups and verbal warnings" in retaliation for her FMLA leave. (Doc. 1-1, ¶ 126). Minor workplace issues—including warnings that do not have a tangible impact on the plaintiff's employment—generally do not constitute adverse employment actions absent evidence of materially adverse consequences. *See Fortner v. DeJoy*, 2022 WL 4591647, at \*20, *aff'd sub nom. Fortner v. Brennan*, 2023 WL 8813574 ("[N]othing in the record showed that these [warnings] were materially adverse in that they would have affected any future pay raise or [the plaintiff's] future job status in any way. On the contrary, the evidence established that these acts had no effect on [her] job status whatsoever.") (quoting *Barnett*, 550 F. App'x at 715); *Bush v. Regis Corp.*, 257 F. App'x 219, 222 (11th Cir. 2007) (per curiam) (affirming district court holding that warning letters and a shift change were insufficient to establish an adverse employment action).

Here, the only warning or write-up following Miller's FMLA leave was the final written warning.[9] (Doc. 21-1, ¶ 33). The warning states:

---

[9] Other bases for relief—write-ups, non-final warnings, and changes in workload—are addressed solely at the causal-connection step. *See* Section III(B), *infra*.

> This final written warning is being issued to emphasize that immediate and continued improvement in your performance is expected. Any other policy or procedure violations, or failure to achieve and sustain improvement in this area or to maintain all standards of performance for your position will result in further disciplinary action, up to and including termination of employment. This final written warning is effective for one year.

(Doc. 20-3 at 110). Essentially, then, because Miller had been issued this final written warning, she was one step away from termination. Because this written warning impacted Miller's future job status, it constituted an adverse employment action. *See Fortner v. Brennan*, 2023 WL 8813574, at *2; *see also Tolliver v. City of Birmingham*, No. 2:25-cv-812, 2026 WL 823304, at *2 (N.D. Ala. Mar. 25, 2026) (holding that, in the discrimination context, movement along a progressive discipline track can constitute an adverse employment action).

Furthermore, Miller's termination plainly qualifies as an adverse employment action for purposes of her FMLA retaliation claim. *See Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1276 (11th Cir. 2020) ("First, [the plaintiff] suffered an adverse employment action because [the defendant] terminated her.") (citing *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234–35 (11th Cir. 2010)). Thus, Miller has satisfied the second prong by demonstrating that she was subject to an adverse employment action.

### B. Miller Cannot Establish a Causal Connection Between Her Protected Activity and the Adverse Employment Action

Although Miller engaged in protected activity and subsequently suffered an adverse employment action, her FMLA claim fails as a matter of law because she has not put forth sufficient evidence of the requisite causal connection between the two. *Batson*, 897 F.3d at 1329.

Insofar as Miller relies on her "write-ups and verbal warnings," she was placed on a performance improvement plan on April 6, 2022, and given a verbal warning on June 3, 2022, but she did not request FMLA leave until July 12, 2022, after the events occurred. (Doc. 1-1, ¶¶ 56, 57). Likewise, the tasks that Miller states were taken away from her were transferred to another team in June 2022, before her leave. (Doc. 20-1 at 86). As a result, these events could not have been motivated by her later FMLA leave. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).

To the extent these challenged acts occurred after Miller requested FMLA leave—including the written warning Regions issued to her on July 13, 2022, and the final written warning they issued to her on December 8, 2022—they were the next steps in performance counseling that began months before her FMLA leave. There is no evidence suggesting that these acts were triggered by her leave. *See id.* ("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does

23

not suffice to show causation."). On the other hand, there is significant evidence to suggest that these acts were triggered by Miller's persistent performance issues.

As to her termination, Miller appears to rely solely on the temporal proximity between it and her FMLA leave to prove causation.[10] (*See* Doc. 23 at 33–36). Even measuring from the end of Miller's FMLA leave in October 2022—the date most favorable to her for purposes of temporal proximity—nearly five months elapsed before her March 2023 termination. This gap in time is too great to establish a causal connection between the events on the basis of temporal proximity alone. *Drago*, 453 F.3d at 1308 ("We have previously held that, in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation. [Likewise, w]e are not persuaded that three months . . . is sufficiently proximate to show causation."); *Higdon v. Jackson*, 393 F.3d 1211 (11th Cir. 2004) ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *Wascura v. City of S. Mia.*, 257 F.3d 1238, 1248 (11th Cir. 2001) ("In light of the other evidence in the record, the three

---

[10] While Miller also contends that "[a] reasonable trier of fact could find pretext based on . . . Regions' shifting and inconsistent explanations," she offers no evidence that Regions' explanations for its adverse employment actions against Miller have changed. (*See* Doc. 23 at 35).

24

and one-half month temporal proximity is insufficient to create a jury issue on causation.").

Further, to prevail on her FMLA claim, Miller must not only demonstrate a causal connection but must ultimately show that "but for" her taking FMLA leave, she would not have been subject to the challenged adverse actions. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023). "[B]ut-for causation 'is established whenever a particular outcome would not have happened 'but for' the purported cause.'" *Id.* at 894 (quoting *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020)). Thus, the but-for test "directs us to change one thing at a time and see if the outcome changes." *Bostock*, 590 U.S. at 656. If it does not, the isolated factor is not a but-for cause, and the defendants' proffered explanations for taking the adverse employment action are sufficient to defeat the plaintiff's claim. *See Lapham*, 88 F.4th at 895.

Miller cannot demonstrate that Regions even considered her FMLA leave in deciding on her termination or the allegedly-retaliatory acts leading up to it, and she certainly cannot show that "but for" her FMLA leave, she would not have been discharged. The undisputed facts demonstrate that she had already been on a performance improvement plan and had numerous counseling sessions and warnings about her performance deficiencies, all *before* she took her protected leave. According to Miller, she believed management was trying to push her out of her job

25

long before she took FMLA leave because of a workplace survey she completed wherein she criticized her manager. (Doc. 20-1 at 67–68, 74, 75, 89). And the evidence is undisputed that following her FMLA leave, the last-straw events that led to her termination were the CAN-SPAM incident and her failure to elevate a regulatory issue. *See Brisk v. Shoreline Found., Inc.*, 654 F. App'x 415, 417 (11th Cir. 2016) (per curiam) ("[T]here is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct.").

Furthermore, it is deemed **admitted**[11] that "while [Miller] was on leave, Regions discovered the extent to which she had not been fulfilling her job duties, which included incomplete tasks that left Regions at risk for operational losses and compliance violations." *Id.*, ¶ 31. It is deemed **admitted** that "[o]n November 8, 2022, Associate Relations met with [Miller] to discuss unfinished tasks that created unnecessary risks and inefficiencies while she was on leave." *Id.*, ¶ 32. It is deemed **admitted** that "[o]n February 8, 2023, during a call with approximately 250 to 300 of Regions' Wealth Associates, [Miller] provided inaccurate information related to consequences when customers opt[ed] out of email communications from Regions, which was a part of her assigned 'CAN-SPAM' project." *Id.*, ¶ 35. It is deemed

---

[11] The facts in this paragraph are deemed admitted for purposes of Regions' Motion for Summary Judgment. *See* Footnote 1, *supra*.

**admitted** that her "misinformation raised significant concerns across the Bank and that after receiving numerous questions and communications related to the inaccurate information, management was forced to issue a mass communication addressing the inaccurate information delivered by [her]." *Id.*, ¶ 36. It is deemed **admitted** that "[o]n February 9, 2023, [Miller's manager] Crump additionally learned that [Miller] failed to adequately document and escalate a potential regulatory issue before taking FMLA leave in July 2022." *Id.*, ¶ 37. And finally, it is deemed **admitted** that "Regions terminated [Miller's] employment on March 3, 2023, *as a result of her unsatisfactory performance*." *Id.*, ¶ 38. (*See also* Doc. 23 at 12–19 (failing to deny or rebut any of the above deemed-admitted facts)).

Even disregarding the deemed-admitted fact that she was terminated not for taking FMLA leave but rather for her unsatisfactory performance, the substantial undisputed evidence of performance issues—as well as the total dearth of evidence suggesting that she was treated negatively in any way for taking FMLA leave— means that no reasonable jury could find that Miller was retaliated against for taking FMLA leave. Accordingly, Regions is entitled to summary judgment on Count III.

## CONCLUSION

For the reasons stated herein, the court **GRANTS** Defendant Regions Bank's motion for summary judgment, (doc. 19), and **DISMISSES** the case. A separate judgment will be issued along with this opinion.

27

**DONE** and **ORDERED** on July 21, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE